## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **TCA FUND MANAGEMENT GROUP CORP., and** | : |
| **TCA GLOBAL CREDIT FUND GP, LTD.,** | : |
| | : |
| **Defendants, and** | : |
| | : |
| **TCA GLOBAL CREDIT FUND, LP,** | : |
| **TCA GLOBAL CREDIT FUND, LTD., and** | : |
| **TCA GLOBAL CREDIT MASTER FUND, LP,** | : |
| | : |
| **Relief Defendants.** | : |
| _____ | : |

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges:

I.    **INTRODUCTION**

1.    The Commission brings this action to enjoin further violations of the federal securities laws by, and obtain disgorgement and civil penalties from, defendants TCA Fund Management Group Corp. ("TCA") and TCA Global Credit Fund GP, Ltd. ("GP," and, with TCA, "Defendants"). The Commission also seeks the appointment of a receiver over Defendants and Relief Defendants TCA Global Credit Fund, LP ("Feeder Fund LP"), TCA Global Credit Fund, Ltd. ("Feeder Fund Ltd.," and, with Feeder Fund LP, "Feeder Funds"), and TCA Global Credit Master Fund, LP ("Master Fund," and, with Feeder Funds, the "Funds"), to ensure a proper wind-up of their business and a fair and appropriate distribution to the Feeder Funds' approximately 470

investors.  As of November 2019, the Funds has assets under management of approximately $516 million.

2.     Feeder Funds raise money from investors and "feed" that money to Master Fund, which provides financing and investment banking services to small- and medium-size businesses. TCA, the investment adviser to the Funds, is entitled to compensation based on the amount of the Funds' assets (the "net asset value," or "NAV"); GP, the general partner of Master Fund and Feeder Fund LP, is entitled to compensation on the amount of Master Fund's profitability.

3.     Since 2010 and continuing through at least November 2019, TCA fraudulently engaged in revenue recognition practices that inflated Master Fund's revenue and the Funds' NAV using two methods.

4.     The first involved Master Fund's lending business between in or about April 2010 and December 2016.  At an early stage of the loan process, the prospective borrower and Master Fund would sign a term sheet outlining the terms of the loan, including the amount of fees the borrower would pay Master Fund when the loan transactions were consummated.  TCA caused Master Fund to recognize these prospective loan fees as revenue upon execution of the term sheet (as opposed to at the closing of the loan), knowing or being severely reckless in not knowing the term sheets were not binding and in many cases did not lead to a funded loan.  Recognizing this loan fee revenue at the time of term sheet execution artificially increased Master Fund's profits and the NAV, which remained inflated until the fee revenue was actually earned (in the case of loans that eventually closed) or removed from the books (in the case of loans that never closed).

5.     The second method involved agreements for Master Fund to provide investment banking services to a company between in or about the latter half of 2016 and November 2019, which provided for the company to pay Master Fund a fee for these services ranging from hundreds

of thousands to millions of dollars.  TCA would cause Master Fund to recognize these investment banking fees as revenue at the time the agreement was signed, even though (a) these companies lacked the financial wherewithal to pay these fees unless Master Fund was successful in obtaining financing for the company, which rarely occurred, and (b) Master Fund had provided few if any services to the company at the time the agreement was signed.  This conduct continued until at least November 2019.

6.     As a result of these practices, Defendants caused the Funds to report to investors that the Funds were profitable every month, with an ever increasing NAV.  In fact, the booking of loan fees at the time of term sheet execution artificially inflated the NAV—at some points in time by as much as $29 million.  The booking of investment banking revenue at the time of agreement execution inflated the NAV by at least $130 million as of November 2019.

7.     The inflated performance and NAV values were provided to investors, and the inflated asset values were included in forms ("Forms ADV") that TCA filed with the Commission.

8.     The Funds' current situation is grim.  For 2017 and 2018, the Funds' auditor issued a qualified opinion with respect to Master Fund's income and assets, including, for 2018, a qualified opinion with respect to 89% of Master Fund's NAV.  By May 2019, Master Fund had only 5% of its assets in cash, with most of the balance of the assets consisting of amounts owed to Master Fund on loans to thinly capitalized borrowers, a substantial amount of which are in default. On January 21, 2020, the Feeder Funds notified their investors that the Feeder Funds had suspended redemptions and would begin to wind-up their affairs.

9.     By engaging in this conduct, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R.

§ 240.10b-5; and TCA violated Sections 206(1), (2), and (4), and 207 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4), and 80b-7, and Advisers Act Rules 206(4)-7 and 206(4)-8, 17 C.F.R. §§ 275.206(4)-7, 275.206(4)-8.  Unless enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

## II.   DEFENDANTS AND RELIEF DEFENDANTS

### A.   Defendants

10.   TCA is a Florida corporation formed in June 2011 and headquartered in Aventura with other offices in New York, Las Vegas, London, England, and Melbourne, Australia.  TCA, a Commission-registered investment adviser since August 13, 2014, serves as the investment adviser to the Funds.

11.   GP, a Cayman Islands company formed in January 2010, is the general partner of Feeder Fund LP and Master Fund.

### B.   Relief Defendants

12.   Feeder Fund LP, a Cayman Islands limited partnership formed in March 2010, engages in investment activities as an unregistered private investment fund.

13.   Feeder Fund Ltd., a Cayman Islands company formed in March 2010, engages in investment activities as an unregistered private investment fund.

14.   Master Fund, a Cayman Islands limited partnership formed in March 2010, serves as the master fund in a master-feeder structure for the Feeder Funds.

## III.   JURISDICTION AND VENUE

15.   This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), 22(a), and 22(c) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1), 77v(a), and 77v(c); Sections 21(d), 27(a), and 27(b) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78aa(a), and 78aa(b); and

Sections 209(d), 214(a), and 214(b) of the Advisers Act, 15 U.S.C. §§ 80b-9(d), 80b-14(a), and 80b-14(b).

16.     Venue is proper in the Southern District of Florida because:  (a) many of Defendants' acts and transactions constituting violations of the Securities Act, the Exchange Act, and the Advisers Act occurred in this District, and (b) TCA is a Florida corporation with its principal place of business in this District.

17.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

IV.     **FACTUAL ALLEGATIONS**

   A.     **Background**

18.     The Feeder Funds raise money by selling securities, and provide the monies raised to Master Fund.  Master Fund provides loans and investment banking services to small businesses. TCA serves as the Funds' adviser.

19.     The Feeder Funds raised money from investors through private sales of securities in the form of, respectively, shares and limited partnership interests.  The shares and limited partnerships are securities within the meaning of Section 2(a)(1) of the Securities Act, Section 3(a)(10) of the Exchange Act, and Section 202(a)(18) of the Advisers Act, 15 U.S.C. §§ 77b(a)(1), 78c(a)(10), and 80b-2(a)(18).  The Feeder Funds have approximately 470 investors, split roughly evenly between high net worth individuals and various types of institutions.  The Feeder Funds invested all of the funds raised in Master Fund.  The Funds have approximately $516 million in assets under management.

20.     TCA has served as the investment adviser to the Funds since September 2011.  TCA provides portfolio management services to the Funds and has discretionary authority to invest the Funds' assets.

21.     Defendants were compensated by the Funds as follows:  (a) TCA was paid a pro rata monthly "management fee" equal to a range of 1.5% to 2% per year of the Funds' NAV, and (b) GP was paid a monthly "performance allocation" equal to a range of 20% to 25% of Master Fund's realized and/or unrealized net profits.

**B.     Master Fund's Business**

22.     Master Fund provided short-term, secured financing to small- and medium-sized enterprises, usually in the form of a debt- or equity-related investment of about $1 to $5 million that required the borrower to pay interest of 12% to 18% annually, plus various fees at closing and over the duration of the loan ("loan fee").  The loan fees ranged considerably, from tens of thousands to millions of dollars per loan.  In addition, borrowers typically issued to Master Fund securities of the borrower in the form of promissory notes, debentures, warrants, and convertible instruments.

23.     At the early stages of a potential transaction, the prospective borrower would sign a non-binding "term sheet" that set forth the possible financing terms.  TCA's underwriting department would then perform due diligence on the transaction.

24.     If TCA decided to move forward, then at closing the transaction documents would be signed and Master Fund would transfer the loan proceeds to the borrower.

25.     At a closing of a financing transaction, borrowers were usually required to sign either an "investment banking" or "advisory services" agreement ("IB Agreement") with Master Fund.  The IB Agreements required companies to pay an "investment banking" or "advisory" fee

("IB Fee") to Master Fund that was "earned upon execution" of the agreement, in consideration for certain services Master Fund claimed TCA would provide the company, including identifying merger-and-acquisition opportunities, preparing business plans and financial models, and assisting with SEC reports.  The IB Fee, which was payable in the form of cash, debenture, or other security, varied considerably from deal-to-deal.

26.     Beginning in the latter half of 2016, Master Fund began entering into IB Agreements with companies that TCA claimed were not seeking financing from Master Fund, for an IB Fee often ranging from hundreds of thousands to millions of dollars.

27.     Many of the companies seeking financing from Master Fund had insufficient cash to meet their working capital needs, and many used the loan proceeds to repay other debts.  A substantial portion of the loans extended by Master Fund defaulted and ended up in litigation.

**C.     TCA's Revenue Recognition Practices Artificially Inflate the Master Fund's Profits and the Funds' NAV, and the Inflated Figures are Reported to Investors and the Commission**

28.     TCA engaged in two revenue recognition practices that fraudulently inflated Master Fund's revenues (and therefore profits) and, as a result, the Funds' NAV.  First, TCA caused Master Fund to recognize the loan fee as revenue at the time the term sheet was signed, instead of waiting for the loan to be approved and funded, which many loans never were.  Second, TCA caused Master Fund to recognize IB Fee income at the time the IB Agreement was signed, even though there was no chance the companies could pay these fees unless they closed on a financing transaction, which they rarely did.  TCA reported these inflated results to investors in monthly "Fact Sheets" and newsletters, TCA and GP distributed monthly account statements to investors that incorporated the inflated figures, and TCA incorporated the inflated results into Forms ADV

filed with the Commission.   Moreover, the inflated results caused the Funds to overpay Defendants.

### 1.    Recognition of Loan Fee Income at Time of Term Sheet Signing

29.    TCA routinely caused Master Fund to recognize the loan fee as revenue at the time a potential borrower signed the term sheet rather than when the loan was funded.  TCA knew or was severely reckless in not knowing that this practice was improper under applicable accounting standards.

30.    TCA knew or was severely reckless in not knowing that signed terms sheets frequently did not lead to funded loans, in which case the loan fee was never earned.

31.    Master Fund's loan-fee revenue-recognition practice increased Master Fund's profits and the NAV.  The loan fee for any particular transaction inflated these figures until the loan actually occurred or until the revenue was removed from the books if the loan was never funded.  To avoid having to make downward adjustments to Master Fund's revenue and the NAV, TCA would cause Master Fund to leave the loan-fee revenue on the books for months or sometimes more than a year after Master Fund had determined not to fund the loan.

32.    In Spring 2016, during the audit of the Funds' 2015 financial statements, Auditors determined that Master Fund needed to adjust its revenue downward by approximately $29 million as a result of improperly recorded loan fee income.  This adjustment would have reduced Master Fund's revenue by 43% and required the Funds to report an operating loss, which was contrary to what TCA had been reporting to investors throughout the year.  Without these adjustments, Auditors would not have given a "clean" opinion with respect to the Funds' financial statements.

33.    To avoid the downward adjustment, in late April 2016, shortly before the completion of the audit, TCA and Master Fund entered into an agreement (executed by GP on

behalf of Master Fund) pursuant to which TCA would assign to Master Fund $34.3 million in income TCA had received or would receive from its business and operations.  In conjunction with the assignment agreement, TCA issued a promissory note in favor of Master Fund for the assigned income, which was not payable until December 31, 2018.  Both documents were dated as of December 31, 2015.  The notes to Master Fund's 2015 financial statements, prepared by TCA on behalf of Master Fund, falsely claimed that the assignment of income and accompanying promissory note were the result of Master Fund having "merged its business practices to be in compliance with current revenue recognition" accounting standards.  As TCA and GP knew or were severely reckless in not knowing, the assignment and note had the effect of papering over the Funds' 2015 losses.

34.     Effective January 1, 2017, TCA largely stopped its practice of recognizing loan fees as revenue prior to loan funding.  As a result, TCA caused certain downward adjustments to be made to the NAV.  TCA paid approximately $1.5 million to investors adversely impacted by its improper recognition of loan fee revenue.

**2.     Recognition of IB Fee Income at Time of Agreement Signing**

35.     TCA would cause Master Fund to recognize IB Fees as revenue at the time the IB Agreement was signed.  This purported revenue ranged from hundreds of thousands to millions of dollars per transaction.

36.     As TCA then knew or was severely reckless in not knowing, Master Fund was unlikely to be paid the vast majority of the IB Fees, because companies that agreed to pay the IB Fees lacked the ability to pay the fees unless the company was able to consummate a financing transaction, which rarely occurred.

37.     TCA also knew or was severely reckless in not knowing that Master Fund had performed few if any of the services recited in the IB Agreements at the time they were signed. Many of the companies in question denied owing any money to Master Fund.

38.     Master Fund continued to engage in this practice even though its auditors (both Auditors and a later auditing firm that replaced them) continuously issued qualified opinions regarding Master Fund's investment banking income because the auditors could not verify whether investment banking revenue met the applicable accounting standards.  The fraudulent recognition of IB Fees inflated Master Fund's NAV by at least $130 million as of November 2019 and resulted in Master Fund improperly recognizing at least $155 million in cumulative revenue from September 2016 through November 2019.

### 3.     Misrepresentation of Performance

#### a.     To Investors

39.     TCA distributed monthly "Fact Sheets" and newsletters to the Funds' investors and prospective investors that TCA knew included inflated NAV balances and false performance figures from the improperly recognized loan fee and IB Fee revenue.

40.     As a result of the inflated NAVs and performance figures, Defendants knowingly distributed to investors monthly account statements falsely representing the amount of their monthly returns and investment balances.  Indeed, the Funds never reported a down month. However, without TCA's inflation of Master Fund's revenue, and therefore the NAV, the Funds would have had numerous months of negative returns since inception.

41.     As a result of the loan fee and IB Fee revenue recognition practices, statements that Defendants made in the Funds' private placement memoranda that NAV inputs would be calculated in accordance with applicable accounting standards were false and misleading.

### b.       In Forms ADV

42.     As a result of Master Fund's loan fee and IB Fee revenue recognition practices, TCA reported inflated assets under management and gross asset value for Master Fund in Forms ADV filed with the Commission on April 1, 2015, September 30, 2015, March 29, 2016, September 15, 2016, March 21, 2017, April 17, 2018, September 14, 2018, and March 29, 2019.

### D.       Funds' Current Status

43.     Master Fund's current auditor has issued a qualified opinion for Master Fund's 2017 and 2018 financial statements.  The auditor's qualifications included:

a.       For 2017, all of Master Fund's investment banking income of $79.7 million (70% of total income) and assets totaling approximately $195 million (approximately 44% of Master Fund's NAV of $447.9 million).

b.       For 2018, $61.6 million in investment banking income (about 47% of total income) and assets totaling approximately $384 million (about 89% of Master Fund's NAV of $430.8 million).

44.     Many of Master Fund's loans are in default, and Master Fund is in litigation with many of its borrowers.  Master Fund, as of December 31, 2018, had loans outstanding of $115,185,926 in its investment portfolio.  In its opinion on the 2018 financial statements, Master Fund's auditors noted that $53,517,722, or 46% of the loans outstanding, were in litigation, and that the auditor could not confirm the validity of an additional $8,658,952, or 8% of the loans outstanding.

45.     Master Fund's cash position has deteriorated considerably the last few years.  While Master Fund historically held 20% to 30% of its assets in cash, beginning in March 2018, its cash

11

position had decreased to less than 10% of its assets, and since May 2019, that amount had declined to below 5% of total assets.

46.     On January 21, 2020, Feeder Funds sent letters to their investors advising that the Funds would be winding up their affairs, citing, among other things, that the Funds had received redemption and withdrawal requests in excess of the Funds' available cash, that the Funds had grown "increasing[ly] illiquid," and that "continued operation of the Funds is no longer commercially viable."

## V.     CLAIMS FOR RELIEF

### Count 1 -- Section 17(a)(1) of the Securities Act
### <u>(Against All Defendants)</u>

47.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

48.     Defendants, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly, directly or indirectly employed devices, schemes, or artifices to defraud.

49.     By reason of the foregoing Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

### Count 2 -- Section 17(a)(2) of the Securities Act
### <u>(Against All Defendants)</u>

50.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

51.     Defendants, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

52.     By reason of the foregoing Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### Count 3 -- Section 17(a)(3) of the Securities Act
### (Against All Defendants)

53.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

54.     Defendants, in the offer or sale of securities by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices, or courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

55.     By reason of the foregoing Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

### Count 4 -- Section 10(b) and Rule 10b-5(a) of the Exchange Act
### (Against All Defendants)

56.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

57.     Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of any security.

58.     By reason of the foregoing Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a).

### Count 5 -- Section 10(b) and Rule 10b-5(b) of the Exchange Act
### (Against All Defendants)

59.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

60.     Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in connection with the purchase or sale of any security.

61.     By reason of the foregoing Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

**Count 6 -- Section 10(b) and Rule 10b-5(c) of the Exchange Act**
**(Against All Defendants)**

62.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

63.     Defendants, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating or will operate as a fraud upon any person in connection with the purchase or sale of any security.

64.     By reason of the foregoing Defendants violated and, unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c).

**Count 7 -- Section 206(1) of the Advisers Act**
**(Against TCA)**

65.     The Commission adopts by reference paragraphs 1 through 46 of this Complaint.

66.     TCA, for compensation, engaged in the business of directly advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. TCA was therefore an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

67.     TCA, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly knowingly or recklessly employed a device, scheme, or artifice to defraud one or more clients or prospective clients.

68.     By reason of the foregoing TCA violated and, unless enjoined, is reasonably likely to continue to violate Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

### Count 8 -- Section 206(2) of the Advisers Act
### (Against TCA)

69.     The Commission adopts by reference paragraphs 1 through 46 and 66 of this Complaint.

70.     TCA, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, negligently engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon one or more clients or prospective clients.

71.     By reason of the foregoing TCA violated and, unless enjoined, are reasonably likely to continue to violate Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

### Count 9 -- Section 206(4) and Rule 206(4)-7 of the Advisers Act
### (Against TCA)

72.     The Commission adopts by reference paragraphs 1 through 46 and 66 of this Complaint.

73.     TCA failed to adopt and implement written compliance policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules promulgated thereunder.

74.     By reason of the foregoing TCA violated and, unless enjoined, is reasonably likely to continue to violate Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Advisers Act Rule 206(4)-7, 17 C.F.R. § 275.206(4)-7.

**Count 10 -- Section 206(4) and Rule 206(4)-8(a) of the Advisers Act**
**(Against TCA)**

75.     The Commission adopts by reference paragraphs 1 through 46 and 66 of this Complaint.

76.     The Funds were "pooled investment vehicles" within the meaning of Rule 206(4)-8(b) of the Advisers Act, 17 C.F.R. § 275.206(4)-8(b).

77.     TCA, directly or indirectly, negligently (a) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in the Funds, and (b) engaged in acts, practices, or course of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the Funds.

78.     By reason of the foregoing TCA violated and, unless enjoined, is reasonably likely to continue to violate Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Advisers Act Rule 206(4)-8(a), 17 C.F.R. § 275.206(4)-8(a).

**Count 11 -- Section 207 of the Advisers Act**
**(Against TCA)**

79.     The Commission adopts by reference paragraphs 1 through 46 and 66 of this Complaint.

80.     In TCA's Forms ADV filed with the Commission pursuant to Section 204 of the Advisers Act, 15 U.S.C. § 80b-4, TCA willfully made untrue statements about the amount of TCA's assets under management and Master Fund's gross asset value.

81.     By reason of the foregoing TCA violated and, unless enjoined, is reasonably likely to continue to violate Section 207 of the Advisers Act, 15 U.S.C. § 80b-7.

## VI.     RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.     Permanent Injunction

Issue a Permanent Injunction restraining and enjoining (a) Defendants from violating Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and (b) TCA from violating Sections 206(1), 206(2), 206(4), and 207 of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4), and 80b-7, and Rules 204(4)-7 and 206(4)-8(a) thereunder.

### B.     Disgorgement

Issue an Order directing Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### C.     Civil Penalty

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78(d)(3), and in addition with respect to TCA, Section 209(e) of the Advisers Act, 15 U.S.C.§ 80b-9(e).

### D.     Appointment of a Receiver

Appoint a receiver over Defendants and Relief Defendants.

### E.     Further Relief

Grant such other and further relief as may be necessary and appropriate.

## F.     Retain Jurisdiction

Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable petition or motion by the Commission for additional relief within the jurisdiction of this Court.

May 11, 2020                                        Respectfully submitted,

                                By:     */s/ Andrew O. Schiff*
                                        Regional Trial Counsel
                                        S.D. Fla. No. A5501900
                                        Direct Dial:  (305) 982-6390
                                        Email:  schiffa@sec.gov

                                        Stephanie N. Moot
                                        Trial Counsel
                                        Fla. Bar No. 30377
                                        Direct Dial:  (305) 982-6313
                                        Email:  moots@sec.gov

                                        Attorneys for Plaintiff
                                        **SECURITIES AND EXCHANGE COMMISSION**
                                        801 Brickell Avenue, Suite 1950
                                        Miami, Florida 33131
                                        Telephone:  (305) 982-6300
                                        Facsimile:  (305) 536-4146

Of counsel:

Shan Chang, Senior Counsel
Raynette R. Nicoleau, Senior Counsel
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone:  (305) 982-6300