**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 20-CIV-21964-CMA**

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

TCA FUND MANAGEMENT GROUP CORP.,
et al.,

        Defendants.

_____/

**RECEIVER'S MOTION FOR APPROVAL OF**
**DISTRIBUTION PLAN AND FIRST INTERIM DISTRIBUTION**

Jonathan Perlman, Esq.
Florida Bar No. 773328
jperlman@gjb-law.com
*Receiver for the Receivership Entities*

-and-

**GENOVESE JOBLOVE & BATTISTA, P.A.**
100 Southeast 2nd Street, 44th Floor
Miami, FL 33131
Tel: (305) 349-2300
John H. Genovese
Florida Bar No. 280852
jgenovese@gjb-law.com
Paul J. Battista
Florida Bar No. 884162
pbattista@gjb-law.com
*Attorneys for Jonathan E. Perlman, Esq.,*
*Receiver for the Receivership Entities*

**TABLE OF CONTENTS**

I.     Introduction.................................................................................................. 1

II.    The TCA Receivership ............................................................................... 3

   A.   Background ......................................................................................... 6

   B.   The Receivership Entities.................................................................. 3

      1.   Receivership Defendants ......................................................... 4

      2.   Relief Defendants ................................................................... 4

      3.   Additional Receivership Entities ........................................... 6

III.   Legal Standard ........................................................................................... 6

   A.   The Framework for a Plan of Distribution ...................................... 13

   B.   Methods of Distribution .................................................................. 15

   C.   Calculation of Distribution.............................................................. 18

IV.   The Distribution Plan ............................................................................... 20

   A.   Methodology .................................................................................... 20

   B.   Receivership Assets......................................................................... 21

      1.   Cash ....................................................................................... 21

      2.   Non-Cash Assets................................................................... 22

   C.   Potential Claimants ......................................................................... 24

      1.   Investors................................................................................ 24

      2.   Subscription Claimants......................................................... 29

      3.   Redemption Claimants ......................................................... 32

      4.   Receivership Administrative Claims ................................... 32

      5.   Trade Creditors .................................................................... 33

   D.   Means of Implementation................................................................ 33

      1.   Investors................................................................................ 34

      2.   Subordinated Investor Claimants......................................... 35

      3.   Subscription Claimants......................................................... 35

      4.   Redemption Claimants ......................................................... 36

      5.   Receivership Administrative Claims ................................... 36

      6.   Trade Creditors .................................................................... 36

V.    Notes and Qualifications........................................................................... 37

VI.   Notice of the Hearing on

      this Motion Should be Deemed Appropriate and Sufficient.................... 38

VII.  Conclusion ............................................................................................... 40

Jonathan E. Perlman, as court-appointed Receiver (the "Receiver") over the Receivership Defendants TCA Fund Management Group Corp. ("FMGC") and TCA Global Credit Fund GP, Ltd. ("GP") (FMGC and GP are hereinafter referred to collectively as "Defendants"), Relief Defendants TCA Global Credit Fund, LP ("Feeder Fund LP"), TCA Global Credit Fund, Ltd. ("Feeder Fund Ltd.," and with Feeder Fund LP, "Feeder Funds"), and TCA Global Credit Master Fund, LP (the "Master Fund") (Master Fund, together with Feeder Funds, are the "Funds"), and Receivership Entity TCA Global Lending Corp. ("Lending Corp") (Defendants, the Funds, and Global Lending are hereinafter referred to collectively as the "Receivership Entities"), pursuant to this Court's order appointing the Receiver [ECF No. 5], respectfully submits his proposed Distribution Plan (the " Rising Tide Plan" or "Plan") for Court Approval and order authorizing an interim distribution under his plan.

## I.    Introduction

The Receiver conducted an investigation of the pre-Receivership activities, which confirmed the allegations by Plaintiff Securities and Exchange Commission ("SEC") in its Complaint and motion for appointment of Receiver. Specifically, the Receiver determined that certain officers, directors, and employees for the Receivership Entities engaged in a scheme that involved misrepresentations to investors, over-stated valuations of assets, and misappropriated funds, all of which had the impact of harming the Receivership Entities to the detriment of the investors and ultimately rendering the Receivership Entities insolvent.

Because of the vast discrepancy between the stated value of the assets at the start of the Receivership and their true value, claimants cannot be made whole from the available assets. Accordingly, the Receiver faces a difficult decision on how best to allocate the available assets amongst the claimants. Mindful of the principle that "equality is equity," *Cunningham v. Brown*,

265 U.S. 1 (1924), the Receiver evaluated the different possible approaches for distribution to attain the greatest equity in this case. After careful consideration and deliberation, the Receiver proposes a distribution methodology that is based upon an equitable *pro rata* methodology called Rising Tide.

The Receiver's Plan proposes an initial distribution ("Initial Distribution") of approximately $55 million, representing approximately 83% of the Receivership's current cash balance, to eligible investors and subscribers who have complied with this Court's order of March 9, 2021 to provide certain information to receive distributions. The Receiver estimates that under the proposed Plan, eligible investors will receive approximately 25% of the dollars invested upon completion of the First Interim Distribution, from a combination of pre-receivership returns and the First Interim Distribution. In other words, following completion of the Initial Distribution, no unsubordinated investor will have out-of-pocket losses greater than 75% of the cash that they invested in the Receivership Entities on an aggregate basis.

To assist the Court and interested parties in evaluating the Distribution Plan, the Receiver analyzed the claims under the two most common equitable pro rata distribution models (Rising Tide and Net Investment). The results of this analysis show that the vast majority of investors fare best under the Rising Tide method. Since the Receiver's analysis shows that the vast majority of TCA investors/subscribers with allowed claims will receive a greater distribution under the Rising Tide methodology and the facts and circumstances of this case support the use of the Rising Tide method, the Receiver concluded that this is the most equitable methodology for distribution in this case to investors and subscribers.

The Receiver and his professionals endeavored to reconstruct the Receivership's financial dealings to determine the most equitable treatment for investor-victims. The most expansive

undertaking of this process required the Receiver to dialogue with approximately 72 financial institution nominees—many of which were located outside the United States—in order to determine the actual net losses of each actual beneficial owner who invested through nominees, almost all of whom were previously unidentifiable. This undertaking was necessary in order to assure that distributions made to one investor through a nominee did not prejudice the rights of another investor who invested through the same nominee and to ensure each investor receives a distribution on account of his/her actual losses. As a result of these efforts, the Receiver is able to propose a transparent distribution scheme that affords each beneficial owner the right to receive a distribution based on the percentage of his/her actual investment loss. In certain instances, nominees were either unwilling or unable to provide information sufficient to permit the Receiver to calculate the losses of the actual beneficial owners. In those instances, the Receiver proposes subordinating the right of those investors to receive a distribution to those investors, which, through nominees or independently, provided a full accounting of their dealings with the Receivership Entities.

To the extent the Receiver is successful in obtaining future litigation and asset recoveries, and converts such assets to cash, he will seek Court approval for additional interim distributions consistent with the rising tide methodology proposed in this Plan.

## II.     The TCA Receivership

### A.      The Receivership Entities

The structure of the funds here is a typical "Master/Feeder" structure. Feeder Fund LP and Feeder Fund Ltd. raised money from investors and "fed" that money to the Master Fund, which, in turn, provided financing to small- and medium-sized businesses. Pursuant to an investment management agreement, FMGC, as investment adviser/manager to the Funds, received a monthly

management fee payable in advance on the first day of each month calculated as a stated percentage of the Funds' reported NAV. Pursuant to a master agreement, GP, the general partner of Master Fund and Feeder Fund LP with discretion to manage their affairs, was compensated by receiving "performance allocations" equal to 20-25% of "realized and/or unrealized net profits."

### 1. Receivership Defendants

#### a) TCA Fund Management Group Corp. ("FMGC")

FMGC is a Florida corporation formed in June 2011 and headquartered in Aventura, Florida. FMGC had other offices in New York, New York, Las Vegas, Nevada, and London, England. Since August 13, 2014, FMCG is the commission-registered investment advisor for the Funds.

#### b) TCA Global Credit Fund, Ltd. ("GP")

GP is registered as a Cayman Islands exempted company formed in January 2010. GP is the general partner of Feeder Fund LP and Master Fund.

### 2. Relief Defendants

#### a) TCA Global Credit Fund, LP ("Feeder Fund LP")

Feeder Fund LP is a Cayman Islands exempted limited partnership formed in March 2010. Feeder Fund LP engaged in investment activities as an unregistered private investment fund. Feeder Fund LP is the smaller of the two feeder funds and was used as a vehicle for primarily U.S.-based investors to invest in the Master Fund. Feeder Fund LP invested its partners' monies directly into the Master Fund.

#### b) TCA Global Credit Fund, Ltd. ("Feeder Fund Ltd.")

Feeder Fund Ltd. is a Cayman Islands exempted company formed in March 2010. Feeder Fund Ltd. engaged in investment activities as an unregistered private investment fund. This is the

larger of the two feeder funds that used primarily as a vehicle for non-U.S.-based investors to invest in the Master Fund.[1]

On May 13, 2020, two days after this Court appointed Mr. Perlman as Receiver over the Receivership Entities, including Feeder Fund Ltd., the Grand Court of the Cayman Islands appointed Ms. Eleanor Fisher and Ms. Tammy Fu, both of EY Cayman Ltd., as joint official liquidators ("JOLs") over Receivership Entity Feeder Fund Ltd. only. The appointment of the JOLs created a concurrent Cayman-recognized fiduciary for Feeder Fund, Ltd. alone.

On February 16, 2021, the JOLs filed a Verified Petition for Recognition of Foreign Proceeding and Motion for Order Granting Related Relief Pursuant to 11 U.S.C. §§ 1515, 1517, and 1520 (the "Chapter 15 Petition") seeking recognition of the Winding Up Proceeding as a foreign main or nonmain proceeding under Chapter 15 of the Bankruptcy Code. [Case No. 21-11513-RAM, ECF No. 1]. The Receiver and JOLs agreed to recognition of the Winding Up Proceeding as a foreign nonmain proceeding for limited purposes set forth in an Agreed Order Granting Recognition of Foreign Nonmain Proceeding and Certain Related Relief (the "Agreed Recognition Order"), and they also agreed to jointly move to withdraw the reference of the Chapter 15 Case to this Court. [ECF Nos. 7, 8]. On June 4, 2021, the Court entered the Withdrawal Order and the Agreed Recognition Order. [*Id.*].[2]

> c)    *TCA Global Credit Fund Master Fund, LP ("Master Fund")*

Master Fund is a Cayman Islands exempted limited partnership formed in March 2010.

---

[1] For an understanding of how Feeder Fund Ltd.'s funds flowed to Master Fund, see the description of TCA Global Lending Corp below.

[2] For additional information concerning the JOLs and the Agreed Recognition Order, please refer to the *Joint Status Report of Receiver and Joint Official Liquidators of LTD Feeder Fund* [ECF No. 154].

Master Fund serves as the master fund in the master/feeder structure for the Feeder Funds. The Master Fund provided financing to small- and medium-sized enterprises. The Master Fund is the sole or majority owner of over 60 borrower entities known as Special Purpose Vehicles or SPVs.

### 3.    *Additional Receivership Entities*

#### a)    *TCA Global Lending Corp. ("Lending Corp.")*

Lending Corp is a Nevada corporation formed in 2015. Its purpose is to act as a "tax blocker" that would reduce or eliminate the obligation to file U.S. tax returns and pay taxes on U.S. business interests and income of Master Fund, for the benefit of foreign investors who invested through the Feeder Fund Ltd. To achieve its purpose, Lending Corp. was inserted as an on-shore entity between Feeder Fund Ltd. and Master Fund. In so doing, taxes on the income of Feeder Fund Ltd. were reduced. According to the Receivership Entities' 2018 tax returns, the flow of funds in relation to Lending Corp. was as follows: Feeder Fund Ltd. invested its shareholders' funds directly into Lending Corp., which invested those funds into the Master Fund. The Master Fund invested the funds from Lending Corp. into SPVs and as loans to various entities.

### B.    Background

On May 11, 2020, the Securities and Exchange Commission ("SEC") filed a Complaint for Injunctive and Other Relief [ECF No. 1] (the "Complaint") in the United States District Court for the Southern District of Florida (the "Court") against Defendants FMGC and GP, and Relief Defendants Feeder Fund LP, Feeder Fund Ltd., and the Master Fund. The SEC also filed an Expedited Motion for Appointment of Receiver (the "Motion for Appointment"). [ECF No. 3].

The Complaint alleges that Defendants engaged in deceptive conduct in violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and 15 U.S.C. § 78j(b),

Exchange Act Rules 10b-5, 17 C.F.R § 240.10b-5; and FMGC violated Sections 206(1), (2), and (4), and 207 of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1), 80(b)-6(4), and 80b-7, and Advisers Act Rules 206(4)-7 and 206(4)-8, 17 C.F.R. §§ 275.206(4)-7, 275.206(4)-8. [ECF No. 1 at ¶ 9].

The Complaint illustrated the details of the fraudulent activities among certain officers, directors, and employees for the Defendants. The Feeder Funds would raise money from investors and "feed" that money to the Master Fund, who in turn, provided financing and investment banking services to small- and medium-sized businesses. [*Id.* at ¶ 2]. FMGC, the investment adviser to the Funds, would then receive compensation based on the Funds' reported assets (the "NAV"). [*Id.*]. GP, the general partner of Master Fund and Feeder Fund LP, would receive compensation based on the reported profitability of Master Fund. [*Id.*].

The Complaint alleged that since 2010 and continuing through at least November 2019, certain officers, directors, and employees  caused FMGC to fraudulently engaged in two different revenue recognition practices that artificially inflated the Master Fund's revenue and the Funds' NAV. [*Id.* at ¶ 3]. The first practice involved the Master Fund's lending business, where, at an early stage of the loan process, the prospective borrower and the Master Fund signed a term sheet outlining the terms of the loan, including the amount of fees the borrower would pay the Master Fund when the loan transactions were consummated. [*Id.* at ¶ 4]. As alleged by the SEC, FMGC caused the Master Fund to recognize these prospective loan fees as revenue upon execution of the non-binding term sheet (as opposed to at the closing of the loan or upon payment) without regard to whether the borrower had the ability to pay such fees. In many cases, loans did not close, and no fees were earned or paid. Recognizing this loan fee revenue at the time of term sheet execution artificially increased the Master Fund's profits and the NAV, which remained inflated until the fee

revenue was actually earned (in the case of loans that eventually closed) or removed from the books (in the case of loans that never closed). [*Id.*].

The second revenue recognition method involved agreements for the Master Fund to provide investment banking services. Starting in or about the latter half of 2016 and continuing through the Funds' last published NAV dated November 2019, the Master Fund solicited companies to enter into agreements ("IB Agreements"), which provided for the company to pay the Master Fund an investment banking fee ranging from hundreds of thousands to millions of dollars. [*Id.* at ¶ 5]. Certain officers, directors, and employees of FMGC caused the Master Fund to recognize these investment banking fees as revenue at the time the agreement was signed, even though these companies (a) lacked the financial wherewithal to pay these fees unless the Master Fund was successful in obtaining financing for the company, which rarely occurred, and (b) received little to no investment banking services from Master Fund. [*Id.*].

As a result, certain officers, directors, and employees for the Defendants caused the Funds to report to investors that the Funds were profitable every month, with an ever-increasing NAV. [*Id.* at ¶ 6]. In fact, the booking of loan fees at the time of term sheet execution artificially inflated the NAV—at some points in time by as much as $29 million. [*Id.*]. The booking of investment banking revenue at the time of agreement execution inflated the NAV by at least $130 million as of November 2019. [*Id.*]. Investors received the inflated performance and NAV values, and forms ("Forms ADV") that FMGC filed with the SEC included the inflated asset values. [*Id.* at ¶ 7]. Armed with these practices, the Defendants raised in excess of $500 million from investors.

The Receivership Entities did not contest these allegations. Rather, they stipulated to entry of a judgment against them for Permanent Injunction and Other Relief and not to contest or deny the Complaint's allegations. [ECF No. 6 and Exhibit 1 thereto]. The Court entered the stipulated

Judgment against Defendants that same day [ECF No. 7] along with an order granting the Unopposed Expedited Motion for Appointment of Receiver [ECF No. 5] (the "Appointment Order"). The Appointment Order appointed Jonathan E. Perlman, Esq., a shareholder at the law firm Genovese, Joblove & Battista, P.A. ("GJB"), as permanent Receiver over the Receivership Entities, granting him "full and exclusive power, duty and authority to: administer and manage the business affairs, funds, assets . . . and any other property of the Receivership Entities, marshal and safeguard all of their assets. . . ." [ECF No. 5 at ¶¶ 1, 7, and 16-17].

The Receiver thereafter moved to confirm and/or expand the Receivership to include Lending Corp. and the Court granted the motion on May 18, 2020. *nunc pro tunc*. [ECF Nos. 15, 16].

Since his appointment, the Receiver and his professionals conducted an investigation into the pre-Receivership business activities of the Receivership Entities as well as the sources and uses of cash for the Receivership Entities. The Receiver's investigation confirmed the material allegations of fraud and misrepresentations of certain individuals as set forth in the SEC's Complaint and Defendants' consent Final Judgment.[3]

Multiple sources confirmed a history of making misrepresentations to investors as to its assets and financial performance, including a review and forensic analysis of books, records and accounts, and interviews of remaining and former employees (collectively the "TCA Employees").

TCA Employees confirmed details regarding the second revenue scheme involving investment banking services. The IB Agreements required clients to execute uniformly required

---

[3] **For additional information concerning the Receivership, interested parties should consult the Receiver's interim reports [ECF Nos. 48, 70, 108, 141 and 163]. The interim reports and other key pleadings are available for download from the Receiver's website: https://tcafundreceivership.com/**

the client to pay an IB Fee or Advisory Fee to Master Fund that was "earned upon execution" of the agreement, in consideration for certain services Master Fund claimed TCA would provide the company.

TCA Employees stated that the IB Agreements were improper "fee vehicles" from their inception. Investment banking fees were a way to book revenue without ever providing a service. These agreements were merely pieces of paper with no viable work-product to back them up. The Receivership Entities provided very little to no investment banking services with the exception of four or five cases. Although TCA's Former Chief Portfolio Manager would on occasion document a "scope of work," typically no work would be performed. In fact, TCA often had no employees with the experience, knowledge or licensing to provide such investment-banking services. Thus, where Master Fund had "scopes of work" and perhaps invoices, these scopes of work and invoices were fraudulent, and virtually none of these fees have been (or could have been) collected.

In reality, the IB Agreements were illusory assets that TCA reported on its monthly NAV calculations. TCA Employees stated that many of the counter-parties were distressed or start-ups companies whose principals were willing to sign IB Agreements stating that they would immediately make payments, when instead the understanding with TCA was that no payments would ever be due and payable unless TCA obtained financing acceptable to them in the future. Moreover, these companies did not have the ability to pay these fees absent future financing. According to the former chief lending officer, it was very rare that TCA could ever obtain debt, capital, or other financing for any such distressed client, since it was self-evident to any investor/lender that that they were unable to service the required financing. Since approximately less than 5% of term sheets were funded, TCA's Balance Sheet showed a large volume of investment banking "fee receivables" that Master Fund recognized as earned upon execution. In

other words, Master Fund generated these IB Agreements that resulted in "booked income" to offset the skyrocketing losses from loan defaults and continue to show positive returns to investors.

It is beyond reasonable dispute that certain officers, directors, and employees of TCA inflated the TCA Funds' monthly NAV from at least January 2016 until the Receiver was appointed by recording overstated or non-existent IB/Advisory contracts and fees. The Receiver's forensic expert Yip Associates' analysis confirmed as much. For example, from January 2016 to December 2019, TCA reported that the IB/Advisory Fee balance due to Master Fund increased by $71.3 million from $63.4 million to $134.7 million. This increase, however, resulted from $349.3 million in new IB/Advisory Fees due from borrowers and $278 million in reductions. The reductions, rather than be on account of receipt of payment of IB/Advisory Fees were almost all non-cash reductions for write-offs relating to reversal of fees. Specifically, 96.6% totaling $268.5 million was for non-cash reductions. Only 3.4% totaling $9.5 million was for payments actually received.

The Receiver's conclusions are also consistent with, and fully supported by, stipulated orders resolving administrative and cease-and-desist proceedings brought by the SEC against Robert Press, TCA's founder, former owner, Chief Executive Officer and director; Steven Rosen, TCA's former Chief Accounting Officer and Chief Financial Officer, Donna Silverman, TCA's former Chief Portfolio Manager, and Michael Vernon, TCA's former Director of Credit and Operations, Chief Operating Officer and Senior Analyst.

The administrative orders contain numerous factual findings , including the following: TCA inflated the NAV and performance of the Master Fund by recording non-binding transactions and overstated investment banking fees on the funds' books and records. From inception through December 2016, Master Fund recorded as revenue unearned accrued interest and fees associated

11

with non-binding term sheets financing deals on the date borrower companies signed. Once recorded, the interest and fees were also recorded as assets of the Master Fund in the form of receivables, and were counted as part of the calculation of the Master Fund's monthly NAV, which also artificially inflated the NAV of each of the feeder funds. Each month Master Fund decided which deals to record on the books and which of the previously recorded term sheet only deals that had not closed to remove. Even though term sheet deals had not closed, and in many instances did not lead to consummated transactions, year after year, TCA continued to record these deals as revenue and include them as assets in the valuation information used to calculate the NAV.

After the SEC began to investigate Defendants' practice of recognizing loan fees as revenue prior to loan funding, TCA stopped that practice (by January 1, 2017) and Master Fund began its practice of improperly recording as revenue investment banking service fees that were uncollectible. From January 2016 to January 2019, Master Fund recognized revenue from investment banking fees upon execution of the IB Agreements, despite the fact that the fees were uncollectable.

Robert Press' administrative order also included findings that on at least 14 separate occasions he waived monthly management and performance fees that the TCA funds owed to TCA or TCA-GP, without disclosing the waivers, in order to mislead investors into believing that TCA's investment strategies were the reason for the Funds' positive performance.

With respect to Mr. Press, the Receiver has asked that he submit to for deposition where his testimony will be taken under oath. Counsel for Mr. Press has informed the Receiver's counsel that any such deposition, Mr. Press will be invoking his Fifth Amendment privilege to all questions. The Receiver views this as also supportive of the Receiver's findings above.

**III.    Legal Standard**

### A.    The Framework for a Plan of Distribution

"A district court has broad powers and wide discretion to determine relief in an equity receivership." *SEC v. Quiros*, 966 F.3d 1195, 1199 (11th Cir. 2020) (internal quotation marks omitted) (a "complicated receivership proceeding" where "[m]any collateral cases sprung from the SEC action"). "This discretion derives from the inherent powers granted an equity court to fashion relief," *SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344 (11th Cir. 2017), and the fact that "most receiverships involve multiple parties and complex transactions," *SEC v. EB5 Asset Manager, LLC*, No. 15-62323-CIV, 2016 WL 11486857, at *3 (S.D. Fla. Dec. 8, 2016).

Based on these broad powers, a district court is "obligated to devise an equitable system of distribution with the goal of treating each victim of the investment fairly and as nearly equal as possible." *EB5 Asset Manager, LLC*, 2016 WL 11486857, at *3; *see also SEC v. HKW Trading LLC*, No. 8:05-CV-1076-T-24-TB, 2009 WL 2499146, at *5 (M.D. Fla. Aug. 14, 2009) ("Court[s] . . . must make sure that the distribution of the limited funds in the estate is fair, just, and reasonable.").[4]

Stated differently, a receiver "has the authority to classify claims sensibly," *SEC v. Pension Fund of Am. L.C.*, 377 F. App'x 957, 962 (11th Cir. 2010), and, if needed, "subordinate the claims of certain investors to ensure equal treatment," *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 333 (7th Cir. 2010). For example, a receiver may subordinate the claims of those who bear some responsibility for furthering the fraudulent scheme. *See SEC v. Forte*, No. 2:02-CV-39, 2012 WL

---

[4] Recently, the Eleventh Circuit, adopting the approach of three other circuits, held that "the district court's order approving the receiver's distribution plan is appealable as a collateral order." *Torchia*, 922 F.3d at 1315. As such, "a district court's decisions relating to the choice of a distribution plan for the receivership are reviewed for abuse of discretion." *EB5 Asset Manager, LLC*, 2016 WL 11486857, at *3 (citing *Elliot*, 953 F.2d at 1569-70).

1719145, at *3 (E.D. Pa. May 16, 2012) ("Those Investors who, by their reckless behavior, furthered Forte's Ponzi scheme plainly are not 'innocent' and so are not entitled to the same relief as truly innocent Investors."); *SEC v. Byers*, 637 F. Supp. 2d 166, 184 (S.D.N.Y. 2009) ("The Receiver's proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw."); *SEC v. Enter. Trust Co., No. 08 Civ. 1260,* 2008 WL 4534154, at *3 (N.D. Ill. October 7, 2008) ("Disqualifying those who took the business over the edge is the most common feature, and the least contested aspect, of distribution plans.").

Further, the Court also has the power to subordinate the claims of general creditors to the claims of defrauded investors, even if the result would be to deny general creditors any compensation at all. *See SEC v. Great White Marine & Recreation, Inc.*, 428 F.3d 553, 556 (5th Cir. 2005) (holding that court did not abuse its discretion in approving receiver's plan to "grant[] priority to equity holders over creditors in distribution"); *HKW Trading LLC*, 2009 WL 2499146, at *3 ("Payment to claimants whose property was unlawfully taken from them is given a higher priority than payment to the general creditors."); *see also* Kathy B. Phelps, *Handling Claims in Ponzi Scheme Bankruptcy and Receivership Cases*, 42 Golden Gate U. L. Rev. 567, 572-73 (2012). This may also include an outright denial of a claim by an interested party. *See Pension Fund of Am. L.C.*, 377 F. App'x at 962-63 (holding that the district court did not abuse its discretion when it precluded former sales agent from recovering more than eight million dollars in unpaid commissions from company's receivership estate, following SEC's investigation of company, since sales agent had contributed to company's perpetration of fraud on its customers by recruiting investors who ultimately were victimized by scheme and suffered losses).

A receiver's objective, therefore, is to "determine how and to whom the money will be

distributed." *Id.* (internal quotation marks omitted). In the end, the distribution plan should strive to "grant fair relief to as many investors as possible," SEC v. *Torchia*, 922 F.3d 1307, 1311 (11th Cir. 2019), while doing so "in a logical way," *Pension Fund of Am. L.C.*, 377 F. App'x at 962 (internal quotation marks omitted).[5]

Indeed, "[t]here are no set rules or specific plan terms or means of implementation that govern distribution plans in federal equity receiverships." *SEC v. Sunwest Mgmt., Inc.*, No. CIV. 09-6056-HO, 2009 WL 3245879, at *8 (D. Or. Oct. 2, 2009). A distribution plan should include the "identity of the investors," "the amounts of their purported claims," and "what percentage of the assets of the receivership estate is to be distributed to each of the investors." *EB5 Asset Manager*, 2016 WL 11486857, at *4. In summary, so long as a distribution plan is fair and reasonable, it should be approved. This is especially true where "funds are limited, [and] hard choices must be made." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006).[6]

### B.     Methods of Distribution

"Receivership cases . . . often involve the issue of whether to use a pro rata distribution or a tracing method when determining the appropriate form of relief for defrauded investors' claims." *HKW Trading LLC*, 2009 WL 2499146, at *5 (citing *SEC v. Elliott*, 953 F.2d 1560, 1569-70 (11th

---

[5] A receiver who has chosen a plan of distribution is not bound to stay committed to that plan for the remainder of the receivership. The receiver, in fact, can "change[] his position" or "use[] a different methodology" as permitted by the extensive discretion given to him by the district court. *Commodity Futures Trading Comm'n v. Eustace*, No. CIV.A. 05-2973, 2008 WL 471574, at *4 n.8, *6 (E.D. Pa. Feb. 19, 2008).

[6] A receiver's authority to distribute assets may include the authority to liquidate assets. Depending on the circumstances, a district court's equitable authority may "extend[] to approving a liquidation of the receivership estate." *Byers*, 637 F. Supp. 2d at 176. Accordingly, a distribution plan may also include a liquidation plan. *See id.* at 175-76.

Cir. 1992)); *see also Byers*, 637 F. Supp. 2d at 176 (recognizing that distribution can also be made based on "level of risk," timing of investment," or "some other factor").

Notwithstanding a receiver's available alternatives for distributions, "case law . . . is quite clear that pro rata distributions are the most fair and most favored in receivership cases." *Byers*, 637 F. Supp. 2d at 176.  Indeed, "[t]racing . . . has been almost universally rejected by courts as inequitable." *Id.* at 177 (citing *Elliott*, 953 F.2d at 1569); *see also id.* (noting that tracing is "difficult, time-consuming, and expensive"). Indeed, even if it is possible for a receiver to employ tracing, a district court will not abuse its discretion "by disallowing tracing." *Elliot*, 953 F.2d at 1569 (disallowing tracing because it would allow a defrauded investor to recoup his entire investment, which would elevate his position over that of similarly situated victims and cause an inequitable result); *see also SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (finding that the district court did not abuse its discretion in approving a pro rata distribution plan even though the party's assets were held by a fraudster in a segregated account); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (holding that the district court did not err in approving a pro rata distribution plan despite the fact that the majority of funds were traceable to one victim).

Courts have set forth two factors that must be satisfied to approve a pro rata distribution. First, investors' funds must have been commingled. *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-89 (2d Cir. 2002). The evidence of commingling does not necessarily have to be "systematic." *Eustace*, 2008 WL 471574, at *7. "A substantial body of case law concerning distributions through federal equity receiverships supports equitable pooling of the assets of receivership entities in order to enable pro rata distributions to investors. . . ." *Sunwest Mgmt., Inc.*, 2009 WL 3245879, at *10.

In certain cases, courts may ignore the separate identities of entities. *Byers*, 637 F. Supp. 2d at 180-81; *see also Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107,

1110 (9th Cir. 1999) (treating entities as one fund); *Sunwest Mgmt., Inc.*, 2009 WL 3245879, at

*8-10 (holding that receivership entities were to be considered a single fund for distribution

purposes due to extensive commingling of funds); *SEC v. AmeriFirst Funding, Inc.*, No.

CIV.A.3:07-CV-1188-D, 2008 WL 919546, at *4 (N.D. Tex. Mar. 13, 2008) (finding a pooled

distribution was equitable).

> The major characteristics of a master-feeder structure are: (1) the master fund and
> each of the feeder funds is organized as a separate legal entity; (2) each feeder fund
> generally invests all of its investable assets in the master fund; (3) interests in the
> master fund are sold privately to one or more feeder funds and the interests in the
> feeder funds are, in turn, sold privately to investors; (4) the portfolio management,
> fund accounting and custody functions of a traditional unregistered fund are
> performed at the master fund level; and (5) the distribution, shareholder servicing
> and administration functions of a traditional unregistered fund are performed at the
> feeder fund level.

Darla M. Fera, ¶ *1115 Special Structures* (2016).  Here, the investor funds were raised and

deployed through a master-feeder structure that supports treating investors in separate feeder funds

equally. Based on the structure of the master-feeder structure in this case, which caused a

comingling of assets, the first requirement for a pro rata distribution is satisfied.

Second, the victims/investors must be similarly situated "with respect to their relationship

to the defrauders." *Credit Bancorp, Ltd.*, 290 F.3d at 88-89. So, "where a victim seeking

preferential treatment cannot materially distinguish his situation from that of other victims, a pro

rata distribution is recognized as the most equitable solution." *SEC v. Alleca*, No. 1:12-CV-3261-

WSD, 2017 WL 5494434, at *3 (N.D. Ga. Nov. 16, 2017). As such, in pro rata distributions,

"investors generally occupy the same legal position as other investors." *EB5 Asset Manager*, 2016

WL 11486857, at *4 (dividing property and cash into 17 separate parcels of equal value based on

independent third party appraisals where each of the parcels was randomly assigned to each

defrauded investor pursuant to a blind lottery process that was overseen by the district court). Here,

the Receiver's investigation found that the investors were similarly situated. As such, a pro rata distribution is the most equitable approach and the approach the receiver should use in this case.

### C.      Calculation of Distribution

A receiver must also select the "method[] of calculating the pro rata distribution." *Byers*, 637 F. Supp. 2d at 181. First, the receiver "could simply ignore any distribution investors received, and base his calculation on the amount of the gross investment." *Id.* This solution is inequitable if there are a large number of investors who have already received distributions. *Id.* Second, the receiver, with permission from the court, can demand the investors repay all the distributions they received and then, using the collected funds, make a distribution based on each investor's actual investment. *Id.* This approach is problematic if the respective investor has already spent the money or otherwise no longer has the money. This means of distribution can also be costly if the investor does not want to part ways with his money and the receiver is forced to resort to litigation to reclaim the money. *Id.* These two methods are used sparingly.

As a third alternative, the Receiver could employ the "rising tide" method. *Id.* "Under this allocation method . . . [t]he Receiver will deduct the amount of a claimant's pre-receivership disbursements after calculating the claimant's pro rata share of any distribution." *SEC v. Detroit Mem'l Partners, LLC*, No. 1:13-CV-1817-WSD, 2016 WL 6595942, at *3 (N.D. Ga. Nov. 8, 2016). "If the result is negative—meaning that the claimant has already received pre-receivership disbursements in excess of his or her calculated pro rata share of a distribution—that claimant will not participate in that distribution, although he or she may participate in later distributions." *Id.* "This method recognizes that claimants have already recovered differing percentages of their investment, and seeks to achieve an equal total percentage recovery for all claimants." *Id.* "The basic goal [of the rising tide allocation] is to equalize recovery for victims regardless of whether

the recovery comes before or after the commencement of the [receivership]." Michael L. Martinez,

*The Ebb of Rising-Tide Distributions in Ponzi Scheme Bankruptcies*, 35 Am. Bankr. Inst. J. 16

(June 2016). "Rising tide appears to be the method most commonly used (and judicially approved)

for apportioning receivership assets." *SEC v. Huber*, 702 F.3d 903, 906 (7th Cir. 2012).

Last, the receiver could implement the net loss or net investment method. *Byers*, 637 F.

Supp. 2d at 171. "Under this approach, any cash distributions received prior to the SEC's filing of

this suit would be subtracted from the total amount invested and that would be the starting point

for the pro rata distribution." *Id.* Although not used with the same regularity as the rising tide

method, courts "sometimes use[]" the net loss method. *Huber*, 702 F.3d at 906. "The net loss

approach is . . . attractive . . . when under rising tide a large number of investors . . . would receive

nothing." *Id.* at 907. "The more investors in a Ponzi scheme there are who would receive nothing

under rising tide and might therefore have difficulty paying their future expenses, the more likely

the net loss method is to maximize the overall utility of the investors." *Id.*

In *SEC v. Huber*, the court articulately described the differences between the rising tide

and net loss methods:

> [I]magine that three investors lose money in a Ponzi scheme. A invested
> $150,000 and withdrew $60,000 before the scheme collapsed, so his net loss was
> $90,000. B invested $150,000 but withdrew only $30,000; his net loss was
> $120,000. C invested $150,000 and withdrew nothing, so lost $150,000. Suppose
> the receiver gets hold of $60,000 in assets of the Ponzi scheme—one-sixth of the
> total loss of $360,000 incurred by the three investors ($90,000 + $120,000 +
> $150,000). We'll call these recovered assets "receivership assets." Under the net
> loss method each investor would receive a sixth of his loss, so A would receive
> $15,000, B $20,000, and C $25,000 . . . .

> Under the rising tide method, withdrawals are considered part of the
> distribution received by an investor and so are subtracted from the amount of the
> receivership assets to which he would be entitled had there been no withdrawals.
> (When there are no withdrawals, rising tide yields the same distribution of
> receivership assets as net loss.) In our example, the total of withdrawn plus
> receivership assets is $150,000 ($60,000 + $30,000 + $0 [the withdrawals] +

$60,000 [the receivership assets]), but there is only the $60,000 in such assets to distribute. A, having been deemed (as a consequence of the rising tide approach) to have "recovered" $60,000 before the collapse of the Ponzi scheme, is entitled to nothing from the receiver, as otherwise the remaining sum of withdrawals and receivership assets—a total of $90,000 ($30,000 in withdrawals, all by B, and $60,000 in receiver-ship assets)—would be insufficient to bring the remaining investors up to anywhere near A's level. For remember that under the net loss method each investor would have received the same fraction of receivership assets as his fraction of the loss, and thus A would have received $15,000, B $20,000, and C $25,000. The result, since under the rising tide method withdrawals are treated as compensation, is that A would have been "compensated" to the tune of $75,000 ($60,000 withdrawn + $15,000 in receiver assets), B $50,000 ($30,000 + $20,000), and C $25,000 (the balance of receiver assets, C having had no withdrawals).

For the "tide" to raise B and C as close to A as possible, B has to receive $15,000 in receiver assets, for a total "recovery" of $45,000, and C the remaining receiver assets, giving him $45,000 too. The division of withdrawals plus receiver assets is then 60–45–45, . . . versus 75–50–25 under the net loss method.

702 F.3d at 904-06. In fact, in at least one instance in the Southern District of Florida, a Court has rejected a receiver's proposal to utilize the net loss method and instead required the receiver to utilize the rising tide method. *See S.E.C. v. Elm*, Case No. 15-cv-60082-WPD at ECF No. 218 (S. D. Fla. May 14, 2019) ("Unlike the net loss method, the rising tide method aims to provide the same proportionate recovery of invested funds to all of the fraud victims regardless of whether they recovered some funds during the scheme.").

## IV.    The Distribution Plan

### A.    Methodology

After weighing the facts and circumstances of this case, the Receiver finds, and recommends, as this Court found in *Elm* that "a rising tide method is the most equitable means of distributing the Receivership funds to the Claimants."

The Receiver identified investor-victims that were recruited to make investments through Feeder Fund LTD and Feeder Fund LP. The Feeder Funds, in turn, transferred investor funds ultimately to the Master Fund, which in turn deployed the monies without regard to or accounting

for the origin of the investment. The Master Fund, in turn, provided liquidity to the Feeder Funds as was necessary for each to satisfy redemption requests or otherwise conduct their affairs.

At this time, the Receiver has sufficient cash assets to propose an initial distribution under the rising tide to equalize distributions among unsubordinated net losers at a minimum return of 25% by distributing $55,452,651 upon approval of the Plan and subject to the terms and conditions cert forth herein.

The Initial Distribution represents a distribution to investors of 83% of the Receivership Estate's current cash. Additionally, the Initial Distribution guarantees that no unsubordinated investor will suffer actual cash losses that exceed 75% of their investment on a cash basis. Finally, the Initial Distribution will permit the Receiver to retain sufficient cash to (i) continue operating the Receivership for purposes of maximizing the value of the Receivership's significant non-cash assets; (ii) equalize distributions to subordinated net loser claimants in the future should circumstances warrant; and (iii) propose future interim distributions as cash becomes available to further "raise the tide" under the proposed rising tide distribution.

### B.   Receivership Assets

#### 1.   *Cash*

At the time of the Receiver's appointment, the Receivership Entities' combined U.S. bank accounts had a total balance of $287,683. As a result of the Receiver's successful recoveries of monies, sale of non-cash assets, as well as institution and resolution of litigation matters, the Receivership Entities' bank accounts at Axos Bank currently has a combined balance of $67,008,922. The Receivership's income and expenses through February 14, 2022 are reflected in the schedule attached as Exhibit A. The Initial Distribution of $55,452,651 will leave the Receivership Estate a cash balance of $11,466,271. *See* [ECF No. 206 at §VI(A) ("Receiver's

Seventh Quarterly Status Report")].

### 2. *Non-Cash Assets*

#### a) *Special Purpose Vehicles*

The Receivership's most valuable assets include businesses that the Master Fund owns (typically as 100% member/manager) through SPVs. The Master Fund often began its relationship with these businesses by providing secured debt financings. When the borrower failed to meet its obligations, the Master Fund filed suit and ultimately executed an Article 9 UCC foreclosure sale of the borrower's assets and transferred those assets to a newly formed entity owned by Master Fund that would resume operations. The Master Fund's investments were funded by the Feeder Funds, but without regard to whether funds were invested by investors or were invested by a particular feeder fund. *See id.* at §VI(B).

In May 2021, the Receiver closed on the sale of TCA Microgrid Energy LLC's assets as approved by the Court (also known as "Pivot Energy"). *Id*. at §III(D).  The Receivership Estate received $52 million in net proceeds from the sale, which are included within the cash assets the Receiver proposed to distribute under the terms of this Plan. The Receiver anticipates distributing cash generated from the liquidation of the remaining SPVs through future interim distributions made under the proposed Rising Tide Plan.

#### b) *Loan Portfolio*

The Receivership Entities' prospectuses, annual financial audits, and monthly and other reports listed performing loans as among the Receivership Entities' most valuable assets. As explained in the Receiver's Quarterly Status Reports, however, the Receiver and his professionals discovered that there were only two performing loans, and two others that were paying regularly, but far less than the monthly amount due under their loan agreements. *Id*. at §III(D).

The Receiver has sought to maximize the value of the loan portfolio by prosecuting collection actions against borrowers indebted to the Receivership Estate where appropriate. The Receiver determined that it is advisable to market and sell the balance of the Receivership's loan portfolio, which has a face value exceeding $110 million. The Receiver anticipates distributing cash generated from the liquidation of the loan portfolio through future interim distributions made under the proposed rising tide plan.

c)      *Third Party Litigation Claims*

The Receiver and his counsel are in the process of identifying and asserting litigation claims against third parties that are liable to the Receivership Estate. *Id*. at §III(K). The proceeds from any recovery obtained through litigating will be made available for distribution in future interim and final distributions. The Receiver anticipates distributing cash recovered from litigation claims through future interim distributions made under the proposed Rising Tide Plan.

d)      *Administrative Order Settlement Proceeds*

On September 30, 2021, the SEC reached a settlement with certain of TCA's former officers and directors. *See* Order Instituting Administrative and Cease-And-Desist Proceedings, Pursuant to Section 8a of the Securities Act of 1933, Section 21C of the Securities Exchange Act of 1934, Sections 203(F) and 203(K) of the Investment Advisers Act of 1940, and Section 9(B) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order, Administrate (the "SEC Settlement") before the Securities and Exchange Commission (Administrative Proceeding File No. 3 – 20610**)**.

The SEC Settlement contemplates that Robert Press will pay $5,457,294 and Donna Silverman will pay $50,000 to the Receivership Estate over a course of 12 months (the "SEC Settlement Funds"). The Receiver anticipates distributing cash recovered from the SEC Settlement

through future interim distributions made under the proposed Rising Tide Plan.

### C.   Potential Claimants

#### 1.   Investors

The Receiver identified 1,461 investors in the Receivership Entities that collectively invested $1,161,425,343 through the Feeder Funds since their inception. In turn, investors withdrew $859,765,182, resulting in total net losses of $301,660,161 (in all instances the Receiver disregards fictitious profits generated from both alleged capital appreciation and reinvestment of unrealized gains)[7].

#### a)   Net Winners

The Receiver identified 568 investors that withdrew from the Feeder Funds more cash than invested on an aggregate cash basis ("Net Winners"). The Net Winners collectively invested $485,907,849 in subscriptions and withdrew $563,602,432 in redemptions, resulting in an aggregate net cash gain of $77,694,583. A schedule detailing the aggregate cash transactions of each Net Winner is attached as Exhibit B. The Rising Tide Plan does not propose making distributions to Net Winners.[8]

#### b)   Unsubordinated Net Losers

---

[7] As a general rule, investors in a receivership are not entitled to false or fictitious profits. Fictitious profits represent the purported appreciation in an investment from purported investment activities as reflected in account statements, contracts, and/or verbal statements to investors. Fictitious profits are only on "paper" because the investors associated with those accounts did not ask for distributions of those purported profits and did not receive any money purportedly representing those fictitious profits. *CFTC v. Equity Fin. Grp., LLC*, 2005 WL 2143975, *23 (D.N.J. 2005) ("[R]ecognizing profits or other earnings in claims for distribution would be to the detriment of later investors and would therefore be inequitable.")

[8] The Receiver, together with his counsel and forensic advisors, is in the process of analyzing the legal and economic viability of potential avoidance/claw-back claims against Net Winners. The Receiver reserves the right to bring an appropriate action against Net Winners at a later date, and does not waive the right to do so by filing this Plan.

The Receiver has further identified 893 investors that invested more cash in the Feeder Funds than they withdrew on an aggregate basis ("Net Losers"). The Net Losers collectively invested $675,517,494 in subscriptions and withdrew $296,162,750 in redemptions, resulting in an aggregate cash loss of $379,354,744.

For the reasons set forth below, the Receiver proposes subordinating for distribution purposes the potential claims of 46 net losers that collectively invested $189,539,333 in subscriptions and withdrew $140,407,957 in redemptions, resulting in an aggregate cash loss of $49,131,376 (the "Subordinated Net Losers").

The remaining Net Losers represent 847 investors that supplied the Receiver with sufficient information to determine the nature and extent of their transactions with the Feeder Funds. This category of Net Loser represent investments of $485,978,161 in subscriptions and withdrawals of $155,754,793 in redemptions, reflecting net losses in the aggregate amount of $330,223,368 (the "Unsubordinated Net Losers").

The Rising Tide Plan proposes to pay the Initial Distribution of $$55,452,651 on a pro-rata basis to 670 Net Losers that have each received a return equal to or less than 25% of their aggregate cash investment. The first allowed investors to receive a distribution will be those who did not receive any payments from the Receivership Entities. Such investors will receive distributions until they have received a percentage return equal to the percentage return of the investors with the lowest non-zero percentage return. Thereafter, investors who did not receive any payments from the Receivership Entities, together with the investors with the lowest non-zero percentage return, will receive distributions until they have received a percentage return equal to the percentage return of investors with the second-lowest non-zero percentage return. This method will be followed until distribution funds are exhausted or until all allowed investors have received

a 100% return, whichever occurs first.

A schedule detailing the aggregate cash transactions of each Net Loser, together with the proposed Initial Distribution to each Unsubordinated Net Loser, is attached as Exhibit C. The Rising Tide Plan, will result in 510 Net Loser investors that have not received any redemption or distribution on account of their investment each receiving a distribution equal to 25% of their actual cash loss, reflecting a total allocation of $34,565,114 of the Initial Distribution. Additionally, the Initial Distribution also provides for 160 investors to receive a pro-rata distribution on account of their aggregate cash losses that will reduce their actual cash loss to a minimum of 75% of their investment. In other words, these investors' redemptions will be equalized to 25% of their aggregate cash losses, reflecting a total allocation of $20,887,537 of their Initial Distribution. In summary, after the Initial Distribution is made, no Unsubordinated Net Loser will have suffered losses of more than 75% of the cash each invested on an aggregate basis.

c)    *Subordinated Net Losers*

On March 8, 2021, the Receiver filed a Motion to Compel Financial Institutions to Disclose the Investment Details of Beneficial Owners. [ECF No. 118] (the "Motion to Disclose"). The Motion to Disclose requested the Court order all nominees acting on behalf of ultimate beneficial owners to within thirty (30) days (i) disclose the identity of the beneficial owner of each investment and/or subscription they facilitated in the Feeder Funds as of January 21, 2020; (ii) provide the Receiver with transaction history (inclusive of dates and amounts) sufficient to determine how much cash each beneficial owner transferred to and received from the Feeder Funds (or any other Receivership Entity); and (iii) provide the Receiver with the know your customer and anti-money laundering due diligence (documents and information) maintained for each beneficial owner in order to permit the Receiver to confirm that he may lawfully transfer funds to each beneficial

26

owner. [Motion to Disclose at ¶ 11].

The Motion to Disclose was necessary because the books and records of the Receivership Entities indicated that a significant number of transactions involving investors were made through intermediary financial institutions acting as nominees for beneficial owners of investments in the Feeder Funds. Often, single nominees acted on account of more than one beneficial owner.

The Receiver's professionals identified 72 potential nominees that collectively invested over 779 million and withdrew over 554 million from the Receivership Entities broken down as follows:

| Currency | Investments | Withdrawals | Net Amount |
|---|---|---|---|
| USD | $638,751,694 | (472,532,825) | $166,218,869 |
| EUR | 39,891,886 | (28,513,465) | €11,378,421 |
| GBP | 82,147,950 | (50,489,606) | £31,658,343 |
| CHF | 19,110,022 | (2,704,686) | F16,405,336 |
| | **779,901,551** | **(554,240,581)** | **225,660,969** |

The pre-receivership books and records only permitted the Receiver to reconcile accounts maintained by nominees in the aggregate—leaving the Receiver with an inability to determine the nature and extent of an individual investor's losses or gains if that individual investor routed their investments and/or subscriptions through a nominee. As a result, the Receiver was unable to verify how much cash was received or distributed to each beneficial owner that invested through a nominee relative to other investors and/or subscribers.

The limitations presented by the Receivership Entities' books and records required the Receiver to either (i) request the Court compel the nominees to disclose the identity and investment details of the beneficial owners; or (ii) seek the disallowance or subordination of distributions to nominees whose beneficial owners would otherwise be entitled to receive a distribution through this Plan.

On March 9, 2021, the Court granted the Motion to Disclose. The Receiver served a copy of the Motion to Disclose and the Order Granting the Motion to Disclose on all nominees by Federal Express and e-mail, each where such information as available from Receivership records. The Receiver also published the Motion to Disclose and Order Granting Motion to Disclose to all investors that had contacted the Receiver or his professionals since its inception as well as on the Receiver's website. The Receiver's professionals spent significant amounts of time communicating with both nominees and ultimate beneficial owners to provide the Receiver with the information necessary to evaluate their potential entitlement to a distribution under this Plan.

The Receiver provided ample notice to all nominees that their failure to provide the Receiver with the requested information could result in the disallowance or subordination of their distribution under this Plan.[9] The Receiver was successful in obtaining the cooperation of most nominees and beneficial owners. In several instances, nominees advised that they were precluded from providing the requested information under their agreements with investors, the prevailing laws in their jurisdictions, or both. In such instances, the Receiver provided the nominees with the opportunity to have their ultimate beneficial owners directly supply the required information to the Receiver's professionals, and some did so.

The Receiver prioritized obtaining the information necessary to formulate this Plan and was successful in doing so in many respects. Notwithstanding, the Receiver was unable to obtain

---

[9] "Equitable subordination does not deal with the existence or non-existence of the debt, but rather involves the question of order of payment." *In re Lockwood*, 14 B.R. 374, 380-81 (Bankr. E.D.N.Y. 1981). "The fundamental aim of equitable subordination is 'to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors . . . .'" *Id.* (quoting *In re Westgate-California Corp.*, 642 F.2d 1174, 1177 (9th Cir. 1981)). "Subordination is an equitable power and is therefore governed by equitable principles." *Westgate-California Corp.*, 642 F.2d at 1177.

complete information from 46 potential claimants which resulted in the subordination of potential

net loser distributions a set forth below:

- Four nominees failed to respond to the Motion to Disclose in any respect. The transactions at issue represent $7,624,217 in subscriptions and $4,114,341 in redemptions, reflecting net losses in the amount of $3,509,876 that have been subordinated for purposes of distribution under the Rising Tide Plan.

- Seven nominees provided deficient productions that resulted in the Receiver's professionals being unable to reconcile the identity of the ultimate beneficial owners or their transactions with the Feeder Funds. The transactions at issue represent $16,440,670 in subscriptions and $10,651,917 in redemptions, reflecting net losses in the amount of $5,788,753 that have been subordinated for purposes of distribution under the Rising Tide Plan.

- 35 nominees failed to provide sufficient information as to permit the Receivers' professionals to reconcile all of the transactions involving their ultimate beneficial owners. As a result, the Rising Tide Plan subordinates those transactions that could not be assigned to a particular beneficial owner because the nominee's records were deficient. The transactions at issue represent $165,474,447 in subscriptions and $125,641,700 in redemptions, reflecting net losses of $39,832,747 that have been subordinated for purposes of distribution under the Rising Tide Plan.

If the Subordinated Net Loser claims had not been subordinated under the Rising Tide Plan,

the Receiver would have been able to equalize their distribution with that of the other net losers

by distributing an additional $917,478. In other words, the cost of "catching up" the Subordinated

Net Losers to the Unsubordinated Net Losers at a minimum recovery of 25% of the investor's net

cash investment is modest in relation to the Initial Distribution. The Receiver may consider

proposing (at a later date and on a case by case basis), an appropriate catch-up payment to any

investor who belatedly provides the Receiver with the information necessary to administer their

respective claim on the same basis as other investors.

### 2.  *Unpaid Subscribers*

Unpaid Subscribers refers to investors who paid subscription monies to Feeder Fund Ltd.

but claim that they did not receive value for the subscription payments and that their funds remain

held in trust by the Receivership Entities. There were 31 Unpaid Subscribers that made deposits

into the Feeder Fund Ltd. accounts at Butterfield-Guernsey Bank between the period of December

6, 2019 through February 3, 2020 summarized as follows:

| Account | Currency | Count | Amount |
|---------|----------|-------|--------|
| BG USD | U.S. Dollars | 23 | $6,756,230 |
| BG EUR | Euros | 7 | €876,016 |
| BG GBP | British Pound | 1 | £55,370 |
| *Total* | | 31 | |

Yip Associates analyzed the Feeder Fund Ltd. accounts at Butterfield-Guernsey Bank in

which Unpaid Subscriber funds were deposited and determined that funds from the various parties

were commingled within the accounts and used to redeem other investors. Therefore, in order to

allocate the remaining refund balance to the Unpaid Subscribers, the Receiver considered the

following tracing methodologies:

- The FIFO (First in First Out) method presumes that funds are disbursed in the order in which they were received. The first funds received are the first funds disbursed. Therefore, the balance in the accounts is attributable to the latest funds received from the Unpaid Subscribers and other sources.

- The LIFO (Last in First Out) method presumes that funds are disbursed by the most recently deposited funds. The last funds received are the first funds disbursed. Therefore, the balance in the accounts is attributable to the earlier funds received from the Unpaid Subscribers and other sources.

- The Pro Rata method assigns relative percentages to each source of Unpaid Subscriber funds and other sources of funds and then allocates withdrawals based on these percentages.

- The LIBR (Lowest Intermediate Balance Rule) method assumes that the bank account balance is allocated to funds from other sources before disbursing Unpaid Subscriber funds. Only when the balance of funds from other sources are depleted, are Unpaid Subscriber funds disbursed.

As mentioned, the bank accounts were commingled, therefore, in order to determine the

amount of remaining funds for each Unpaid Subscriber, the funds must be traced. The FIFO, LIFO,

Pro Rata, and LIBR tracing methods were considered. LIBR was determined to be inappropriate

in this situation. Yip Associates determined that using the LIBR method is not appropriate in this scenario

because there are many different sources of Unpaid Subscriber funds, which need to be treated separately. Under LIBR, the balance of funds from the other sources would be depleted first and then the Unpaid Subscriber funds would be depleted. However, there are several sources of Unpaid Subscriber funds comingled within the remaining account balance after the funds from other sources are depleted resulting in the need to have each source of Unpaid Subscriber funds allocated by applying an additional method of tracing (i.e. FIFO, LIFO, or Pro Rata). Below is a table summarizing the results, in aggregate by account, for the three tracing methods the Receiver considered.

| Account | Currency | Unpaid Subscriber Deposit Total | FIFO Method Remaining Funds | LIFO Method Remaining Funds | Pro Rata Method Remaining Funds |
|---|---|---|---|---|---|
| BG USD | U.S. Dollars | $6,756,230 | $355,166 | $347,250 | $352,051 |
| BG EUR | Euros | €876,016 | €175,000 | €174,686 | €179,865 |
| BG GBP | British Pound | £55,370 | £6,532 | - | £5,217 |

While the amounts in total shown in the summary table above are similar, the amount of remaining funds differed considerably for each Unpaid Subscriber depending on which method was used. A schedule describing the summary results of the FIFO, LIFO, and Pro Rata tracing for each alleged Unpaid Subscriber is attached as Exhibit D. The Receiver proposes to distribute traceable funds according to the *pro rata* method (the "Traceable Funds"), which will benefit the greatest number of so-called Subscriber Claimants.[10] In each instance, the investors that would otherwise receive Traceable Funds are Unsubordinated Net Losers that will participate in the Initial Distribution proposed under the Rising Tide Plan. The proposed rising tide plan does not otherwise grant a priority distribution to any Subscription Claimant, except as to the proceeds of the Traceable Funds.[11]

---

[10] An equity receiver has discretion to fashion a distribution plan or method that maximizes the number of investors who receive a distribution. *See Huber*, 702 F.3d at 907.

[11] A constructive trust may only be imposed on specific or identifiable property or property that can be

### 3.    *Redemption Claimants*

As of December 11, 2020, the Feeder Funds had received requests from fund investors to redeem approximately 5,300 shares representing an aggregate cash value of $44,201,902 ("Redemption Claims"). A schedule of the Redemption Claims is attached as Exhibit E. The Receiver has been advised that the Redemption Claims are afforded priority under Cayman Law and that the JOLs believe that they would be required by Cayman law to grant the Redemption Claims a priority in the distribution of receivership assets. The Receiver has not identified any basis under United States law to compel an inequitable result that would in effect prioritize claimants that sought to liquidate their [highly over stated ] positions from the Feeder Funds to the detriment of other investors. Additionally, prioritizing Redemption Claims could potentially require the Receiver to disburse funds to Net Winners and/or Net Losers in a manner that is inconsistent with the equities of the Rising Tide Plan. Accordingly, the Receiver does not propose creating a special class of Redemption Claimants distinct from the treatment under the proposed Rising Tide Plan.

### 4.    *Receivership Administrative Claims*

To date, the Court has approved $6,827,172.30 in professional fees and $112,449.32 in out-of-pocket costs incurred by the Receiver's professionals. The Receiver has made disbursements $5,449,737.06 in professional fees and $112,449.32 in out-of-pocket costs, representing 80% of professional fees and 100% of out-of-pocket costs. The Receivership remains

---

clearly traced to the business owner. *In Small Bus. Admin. v. Echevarria*, 864 F. Supp. 1254 (S.D. Fla. 1994) ("A constructive trust may be imposed only where the *res* is specific, identifiable property or can be clearly traced in assets of the defendant which are claimed by the party seeking relief, and may not be imposed on defendant's general assets." (emphasis added) (citing *Finkelstein v. Southeast Bank, N.A.*, 490 So. 2d 976, 983 (Fla. Dist. Ct. App. 1986); *Landers v. Sherwin*, 261 So. 2d 542 (Fla. Dist. Ct. App. 1972); *Trend Setter Villas v. Villas on The Green, Inc.*, 569 So. 2d 766 (Fla. Dist. Ct. App. 1990))).

responsible for payment of $1,310,661.71 in professional fee holdbacks (20% of fees) that have been approved by the Court but not yet disbursed. *See* Receiver's Interim Omnibus Applications for Allowance and Payment of Professional Fees and Reimbursement of Expenses [ECF Nos. 55, 73, 111, 142, 171, 191, 206] and the Court's Orders granting same [ECE Nos. 56, 74, 112, 143, 172, 192, 207]. Additionally, the Receivership incurs approximately $2,500 to $5,000 in monthly operational expenses that are paid by the Receiver without the need for additional Court approval under the terms of the Receivership Order.

### 5.     *Trade Creditors*

The Receiver has identified approximately 27 trade creditors that claim to have provided goods and services to either the Receivership Entities or SPVs. These trade claimants include (i) pre-receivership vendors and service providers; (ii) former landlords; (iii) professionals retained by SPVs and Receivership Entities prior to the Receiver's appointment; and (iv) former employees asserting claims for unpaid compensation or damages.

The Receiver estimates that known trade creditor claims will not exceed $3 million. A schedule of all known trade creditors is attached as Exhibit F. At this time, the Receiver does not propose making a distribution to trade creditors. The Receivership Estate has sufficient funds to address *bona fide* trade creditor/vendor claims. The Receiver will endeavor to negotiate trade creditor claims independently, and may propose a distribution to trade creditors at a later date.[12]

### D.     **Means of Implementation**

---

[12] There is no requirement that all claimants be treated in the same manner; rather, fairness only requires that similarly situated claimants should be treated alike. *See, e.g., Quilling v. Trade Partners, Inc.*, No. 1:03-CV-236, 2006 WL 3694629, at *1 (W.D. Mich. 2006) (distinguishing between fraud victims and general creditors); *Byers*, 637 F. Supp. 2d at 184 ("The Receiver's proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw.").

1.    *Investors*

Upon approval of the Plan, the Receiver will require that each Unsubordinated Net Loser entitled to receive an Initial Distribution under the Rising Tide Plan submit a certificate sworn under oath ("Certificate") that attests to the following representations:

- The Unsubordinated Net Loser owns the claim against the Receivership Entity and has not transferred, pledged, hypothecated, or in any way encumbered the right to receive a distribution;

- The proposed Interim Distribution reflects an accurate accounting of the cash invested and withdrawn by the Unsubordinated Net Loser from the Feeder Funds;

- The Unsubordinated Net Loser has not received any collateral source recovery[13] on account of their investment;

- The Unsubordinated Net Loser provides the receiver with ACH/wire transfer instructions and know your customer and anti-money laundering due diligence sufficient to permit the Receiver to confirm that he may lawfully transfer funds to the Unsubordinated Net Loser together with such additional information as may be required for the Receiver to comply with the Bank Secrecy Act; and

- The Unsubordinated Net Loser certifies that they are not a nominee, or otherwise related to or acting on behalf of an Insider.[14]

---

[13] A "collateral source recovery" is defined as the gross amount (i) of cash and non-cash assets received by, available to, received for the benefit of, applied to the indebtedness of, or anticipated to be received by, available to, received for the benefit of, or applied to the indebtedness of (whether made or to be made directly or indirectly to such holder or any agent, attorney, or other third party associated with the holder) on account of or in any way related to such Investor's loss directly or indirectly relating to the Receivership Entities from all parties and sources, including, without limitation, any payments made or to be made to the Investor by any party other than the Receiver, including to the extent applicable from (i) the JOL's of Feeder Fund LTD; and (ii) any third-party litigation recovery. Collateral Source Recoveries do not include any tax benefit from a theft loss deduction taken in accordance with the Internal Revenue Code, or other tax benefits received by an Investor, in either case as a result of losses in connection with the Feeder Funds.

[14] For purposes of the Plan, an "Insider" is defined to include Robert Press, Alysia Prior, Alyce Schreiber, Bernard Sumner, Matthew Luciano, Bruce Wookey, Tara Antal, Donna Silverman, Michael Vernon, and Steven Rosen.

The Receiver will send a Certificate to each Unsubordinated Net Loser qualified to receive an Initial Distribution within thirty (30) days of the approval of this Plan. The Receiver will request that each Unsubordinated Net Loser return the executed Certificate within thirty (30) days of receipt by the Unsubordinated Net Loser. Upon receipt of the Certificate,[15] the Receiver will authorize the transfer of the Initial Distribution contemplated by the Rising Tide Plan.

### 2.    *Subordinated Investor Claimants*

The Receiver does not propose a distribution to Subordinated Net Losers at this time. In the event that future distributions made under the Rising Tide Plan result in all Unsubordinated Net Losers receiving a return equal to at least 100% of the cash they invested through the Feeder Funds, the Receiver will propose by separate application to the Court a process for making distributions to Subordinated Net Losers and/or their beneficiates.

### 3.    *Subscription Claimants*

Upon approval of the Plan, the Receiver proposes distributing the Traceable Funds to the Subscription Claimants on a *pro rata* basis the manner set forth in Exhibits D. Any distribution received by a Subscription Claimant of Traceable Funds shall be applied as a distribution made to the Subscription Claimant and will reduce the Claimant's net loss under the Rising Tide Plan. All Subscription Claimants shall be required to execute a Certificate in the same form as required from the Unsubordinated Net Losers receiving an Initial Distribution. The proposed Rising Tide Plan does not otherwise grant a priority distribution to any Subscription Claimant, except as to the proceeds of the Traceable Funds.

---

[15] For administrative convenience, the Receiver may provide authorization to Axos Bank (the Receivership's financial institution) on a periodic basis. Any funds due to an investor who does not return a duly authorized Certificate may be deemed forfeited and made available for distribution to other investors, but only after the Receiver has filed a motion seeking authority to do so.

### 4.    *Redemption Claimants*

The Receiver does not propose granting priority to Redemption Claimants. The Receiver proposes that distributions to Redemption Claimants be made in a manner otherwise consistent with the Rising Tide Plan.

### 5.    *Receivership Administrative Claims*

The Receiver proposes to continue paying administrative expenses to professionals employed by the Receivership Estates in the ordinary course of business, subject to a 20% holdback and Court approval of interim and final fee applications.  Accordingly, the proposed Interim Distribution under the Rising Tide Plan will not be impacted by the payment of Receivership Administrative claims. Moreover, the Receiver's proposed Initial Distribution reserves sufficient cash for the Receivership to continue operations as it maximizes the value of its remaining assets, and as a result, increases the pool of cash available for distribution at a later date under the Rising Tide Plan.

### 6.    *Trade Creditors*

The Receiver will retain sufficient cash after the Initial Distribution to address trade creditor claims, ("Trade Creditor Reserve"). Each trade creditor will be served with a copy of this Plan. The Receiver and his professionals are in the process of evaluating and negotiating trade creditor claims. The Receiver will seek court approval to pay trade creditors from the Trade Creditor Reserve when this process is complete. Accordingly, the proposed Interim Distribution under the Rising Tide Plan will not be impacted by the potential adjustment of trade creditor claims at a later date. Additionally, the trade creditors will not be prejudiced by the payment of the Initial Distribution because the Receivership retains sufficient cash to address their claims at later dates should it be determined that it is appropriate to pay trade creditor claims from funds that are

otherwise available to satisfy investors.

**V.     Notes and Qualifications**

The information compiled to prepare the Rising Tide Plan was obtained from the following

prime sources:

- Trades Export provided by former fund administrator, Circle Partners, on June 23, 2021 ("Trades Export").

- Subscription Contract Notes and Redemption Contract Notes provided by Circle Partners.

- Bank statements and supporting documents produced to date by financial institutions.

- Ultimate beneficial owner records provided by either investor nominees or directly from the ultimate beneficial owners.

- Currency conversion rates obtained from https://excelrates.com/.

The Rising Tide Plan is conditioned by the following assumptions:

- The distribution analysis is based on the distribution amount needed to bring investors to a total recovery of at least 25% under the Rising Tide Method.  The same distribution amounts have been used to calculate the Net Investment (Pro Rata) Method.

- Some investments were made using different currencies including Euros, Swiss Francs, and Great British Pounds.  The net investment losses were converted to US Dollars for purposes of this distribution analysis using conversion rates as of the date of the Receiver's appointment on May 11, 2020 (source: https://excelrates.com/).

- The Trades Export includes transfer activity between investors and switch activity between currencies. Yip Associates has reconciled these transfers and switches and eliminated any gains records at the time of each transfer and switch. To the extent that Yip Associates was unable to reconcile the transfers and switches based on the information received to date, the claims have been subordinated. The transfer and switch activity are included in the subscription, redemption, and net investment amounts used to calculate the distribution.

- Yip Associates has reconciled the Trades Export transactions to bank records received to date as well as ultimate beneficial owner records produced by Nominees to date. To the extent that the ultimate beneficial owner was not identified through the documents produced by Nominees the claims have been subordinated.

- The distribution analysis includes investments made into Feeder Fund Ltd. and Feeder Fund LP on a combined basis.

- The Net Investment Method uses a pro rata percentage to calculate the distribution allocation to each investor. All investors would participate in a Net Investment Method distribution. The distribution as a percentage of the net investment amount would be the same for every investor who is eligible to participate in the distribution.  In the Rising Tide Method, first, the investors' percentage of loss is determined. Then, the distribution is calculated first to those investors with the largest percentage of loss until either all creditors reach the same percentage of loss or the funds available for distribution are depleted.

**IRS CIRCULAR 230 NOTICE:**  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, INVESTORS, CREDITORS AND PARTIES-IN-INTEREST ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY INVESTORS, CREDITORS AND PARTIES-IN-INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE RECEIVER'S REQUEST FOR APPROVAL OF THE DISTRIBUTION PLAN ONLY; AND (C) INVESTORS, CREDITORS AND PARTIES-IN-INTEREST SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS PLAN WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE UPON THE MERITS OF THE PLAN.  NEITHER THIS PLAN NOR THE DISCLOSURES CONTAINED WITHIN IT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DOCUMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.

**VI.    Notice of this Motion Should be Deemed Appropriate and Sufficient.**

The Receiver will post this Motion and any corresponding notice of hearing, briefing

schedule, or response deadline that may be imposed by the Court on the Receiver's website (https://tcafundreceivership.com/).  The Receiver will also direct his counsel to email the foregoing to all investors that (i) received the Motion to Disclose; (ii) were registered with Circle Partners; or (iii) that have otherwise communicated with the Receiver in response to the Motion to Disclose. Additionally, the Receiver will serve the foregoing by U.S. Mail and e-mail to the known non-investor creditors of the Receivership Entities.

The Receiver requests that the Court approve this form of notice as reasonable, appropriate, and the most cost-effective means of providing notice of the hearing under the circumstances, since there exceeds approximately 1,400 investors both in the United States and overseas, and to the extent necessary, to approve the notice given as reasonable, limited notice appropriate under the circumstances and in the interests of time and cost. This Court, as a court of equity supervising the receivership estate, may make appropriate administrative orders governing the receivership, including limitations on, and changes in, notice and other procedures. *See* Fed. R. Civ. P. 5(a) and (c) (authorizing the court to modify service procedures when numerous defendants are involved in litigation). Orders limiting notice when the Bankruptcy Code or Rules would otherwise require notice to all creditors are routinely granted in bankruptcy cases to promote the expeditious and economical administration of bankruptcy estates. *See In re Basil St. Partners, LLC*, 477 B.R. 856, 866 (Bankr. M.D. Fla. 2012) (noting the "underlying policy that certain bankruptcy cases, by necessity, [] be handled expeditiously," and "provid[ing] flexibility . . . ." (citing 11 U.S.C. § 102(1)(A) (defining the phrase "after notice and a hearing" to mean "after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances")); *see also In re First Alliance Mortg. Co.*, 269 B.R. 428, 442 (C.D. Cal. 2001) (referencing in dicta the bankruptcy court's order limiting notice issued in that case).

## VII.     Conclusion

WHEREFORE, the Receiver respectfully requests that the Court grant the Motion and all

relief requested therein.

Dated:          February 28, 2022
                Miami, Florida

                                        Respectfully Submitted,

                                        Jonathan Perlman, Esq.
                                        Florida Bar No. 773328
                                        jperlman@gjb-law.com
                                        *Receiver for the Receivership Entities*

                                        -and-

                                        **GENOVESE JOBLOVE & BATTISTA, P.A.**
                                        100 Southeast 2nd Street, 44th Floor
                                        Miami, FL 33131
                                        Tel: (305) 349-2300
                                        Greg Garno
                                        John H. Genovese
                                        Florida Bar No. 280852
                                        jgenovese@gjb-law.com
                                        Paul J. Battista
                                        Florida Bar No. 884162
                                        pbattista@gjb-law.com
                                        *Attorneys for Jonathan E. Perlman, Esq.,*
                                        *Receiver for the Receivership Entities*

### S.D. Fla. L.R. 7.1(A)(3) CERTIFICATE OF CONFERENCE

Undersigned counsel certifies that he conferred with counsel for the SEC via phone and

email regarding the requested relief and is authorized to represent that the SEC has no objection

to the relief sought herein. Undersigned counsel certifies that he also conferred with counsel for

the JOLs, who indicated that they will be filing a response to the Motion.

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the foregoing was served via CM/ECF Notification and/or U.S. Mail to all parties and notification of such filing to all CM/ECF participants in this case on the 28th day of February, 2022. In addition, proper, timely, adequate, and sufficient notice of the Motion was provided via email to the investors, stakeholders, and/or interested parties' email addresses listed in Exhibit G and via email and/or U.S. mail to all known non-investor creditors listed in Exhibit H.

/s/ *Gregory M. Garno*_____
Attorney

[12455-001/3476748/3]