# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | | |
|---|---|---|
| THOMAS DAY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action File No.: |
| | : | |
| TCA FUND MANAGEMENT | : | |
| GROUP, CORP.; TCA GLOBAL | : | JURY TRIAL DEMANDED |
| CREDIT FUND, LTD.; | : | |
| ROBERT PRESS; | : | |
| ALYCE SCHREIBER; and | : | |
| WILLIAM FICKLING, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff, through undersigned counsel, hereby files his Complaint against Defendants, showing the Court as follows:

## Parties

1.      Plaintiff Thomas Day ("Day"), at all times relevant to this case, was a resident of Georgia.

2.      Defendant TCA Fund Management Group, Corp. ("TCA"), at all times relevant to this case, was the acting investment manager ("IM") of the TCA Global Credit Master Fund ("GCMF" or "the Fund"), which is an alternative investment

1

fund with United States offices in Aventura, Florida and New York, New York and foreign offices in London, England and Sydney, Australia.

3.      Defendant Robert Press ("Press"), at all times relevant to this case, was the General Partner,  Founder and President of TCA and handled the flow of cash between the Fund and TCA and personnel decisions.  He is a resident of Florida.

4.      Defendant Alyce Schreiber ("Schreiber"), at all times relevant to this case, was the acting CEO of TCA and, along with Press, handled the flow of cash between the Fund and TCA and personnel decisions.  She is a resident of Florida.

5.      Defendant William Fickling ("Fickling") was TCA's former head of corporate restructuring and, at all times relevant to this case, was TCA's acting Chief Operating Officer (COO), and along with Press and Schreiber, handled the flow of cash between the Fund and TCA and personnel decisions. He is a resident of Georgia.

## **Jurisdiction and Venue**

6.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Count I of this Complaint, which arises out of the Dodd-Frank Act, 15 U.S.C. § 78u-6(h).

7.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1 3 6 7

o ver Count II which arises under state law.

8.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because the employment practices described herein occurred within the Miami Division of the S o u t h e r n District of Florida.

### Statement of Facts

*TCA's Fund Structure*

9.    TCA earns income through several revenue streams including incentive, commitment, execution, interest accruals, service, closing, management, performance, and other fees associated with its various funds ("the Funds").

10.    Upon information and belief, the Funds include: TCA Global Credit Fund GP, Ltd. (the general partner fund); TCA Global Credit Fund, LP (an onshore feeder fund); TCA Global Credit Fund, Ltd. (an offshore feeder fund, "GCF"); TCA Global Lending, Corp. (a US tax blocking entity); and TCA Global Credit Master Fund, LP (the main fund, or "GCMF"); the Special Situations Credit Strategies ICAV (a fund registered in Ireland, or the "ICAV"); the TCA Opportunities Fund I, LP ("OPPS"); and the TCA Tamwheel UK LP ("TMWL").

11.    The GCMF is a direct lending fund in the alternative asset space that identified and made direct, asset-based loans ranging from approximately one to five million dollars in small and medium-size enterprises ("SMEs").

3

12.   GCMF was TCA's largest fund and the one where Plaintiffs principally worked.

13.   GCMF was managed by TCA and its administrator was Circle Partners.

14.   TCA Global Credit Fund, LP and TCA Global Credit Fund Ltd ("GCF") were "feeder" funds that were invested in GCMF.

15.   Plaintiffs and individual Defendants also worked with the ICAV Fund, which was formerly known as TCA Special Situations Credit Strategies and TCA Credit Strategies, is a Central Bank of Ireland chartered Irish Collective Asset Vehicle that is owned and operated by TCA and administered by APEX.

16.   The OPPS and TMWL funds are also, upon information and belief, operated by TCA.

17.   Upon information and belief, the ultimate owner of the bank accounts for these Funds is a trust for the benefit of Press' minor children and in which Press serves as the trustee.

*Thomas Day's Employment*

18.   Day was hired as TCA's Chief Credit Officer ("CCO") in January 2018 and assigned to new loan underwriting and possible investments within the GCMF.

19.   In this role, Day was member of TCA's executive leadership and management team responsible for a total credit portfolio of over $500 million with

expected annual originations of $180 million.

20.   Day also formed TCA's Credit and Investment Committees and served as its Chairman.

21.   In the scope of his professional duties, Day had access to information concerning TCA's risk related policies and procedures, loan underwriting, portfolio administration, loan closings, cash disbursements, debt consolidation, working capital, loan portfolios, and ongoing transaction management.

## *TCA Charged Borrowers Fees for Services Not Rendered*

22.   Upon information and belief, the Securities and Exchange Commission ("SEC") conducted an examination covering the period 2014 through 2015 resulting in a findings memo signed by SEC Assistant Regional Director Jeannie Cabot and issued to TCA on March 3, 2016 that uncovered, among other things, accounting irregularities composed primarily of recording deals prior to loan closing to inflate their assets under management ("AUM").

23.   Upon information and belief, beginning in 2017, Defendants attempted to circumvent SEC detection and continued to inflate their AUM and offset losses by devising a new fraudulent scheme using Investment Banking Services Agreements (IBSAs).

24.   In addition to being responsible for paying a commission if their loans were

funded, TCA's potential borrowers were required to sign a "non-binding" term sheet that required the borrower to pay an execution fee, among other fees.

25.    In almost every case until mid-2019, potential borrowers were simultaneously asked to sign a "binding" IBSA which was "considered due and payable upon execution."

26.    For example, a typical loan application for a borrower might include a potential loan of $2.5 million with an IBSA between $500,000 and two million, meaning that the loan's interest rates, inclusive of the fee agreement(s), were effectively 40 to 50 percent, or higher.

27.    Day repeatedly told Defendants Fickling and Press that TCA (which employed no investment banker and was not a registered broker-dealer) needed to hire an investment banker if IBSAs were going to be applied to potential transactions and even provided resumes for possible candidates.

28.    No investment banker was ever hired, and, in early to mid-2019, TCA re-characterized the IBSAs as "Financial Consulting Fee Agreements."

29.    After signing the term sheet and fee agreements, borrowers' loans went to underwriting to determine if they were viable for funding.

30.    The default rate on the IBSAs was over 95 percent because the majority of borrowers refused to pay for investment banking services they did not receive, or

investment banking services associated with a loan that was not closed.

31.    Defendants falsified records, such as invoices and scopes of work stating that TCA provided investment or consulting services to these borrowers.

32.    For those loans that did close, Defendants "wrapped" the IBSA fees into the loans themselves, making it appear as though the borrowers paid the IBSA fees, regardless of whether or not they did, and charged borrowers interest on the wrapped fees thereby inflating accrual income.

<p style="text-align:center"><em><u>TCA Reported Income from Borrower Fees It Did Not Receive</u></em></p>

33.    Although TCA did not actually render services for these fees, or receive payment for them, it continued to report a large and growing volume of IBSA "fee receivables" on its balance sheet.

34.    For example, in 2017, TCA reported $59 million in IBSA deals, but only $30 million (or 50.8 percent) of these deals had an associated loan closing.

35.    Nevertheless, in the same year (2017), the $29 million worth of the IBSA deals that did not receive funding/loans remained on TCA's balance sheet as IBSA fee receivables (or "orphaned" fees unrelated to any underlying loans) resulting in an inflated AUM.

36.    The same pattern worsened in 2018, with TCA reporting $61 million in IBSA deals while only funding $6.4 million (or 10.5 percent) in loans and leaving

over $55 million in "orphaned" fees.

37.    Once again, in 2019, TCA reported $39 million in IBSA deals while only $575 thousand (or 1.5 percent) in loans were funded, leaving $38.6 million in "orphaned" fees.

38.    Ultimately, TCA reported $178 million of IBSA income for the period of October 2016 through November 2019.

*TCA Falsely Reported Income to Inflate its Overall Income and Performance*

39.    Notably, for thirty-three of the thirty-eight months from October 2016 through November 2019, IBSA reported income exceeded net income.

40.    Indeed, during the tenure of Patrick Primavera—the managing director of TCA's New York Office, which originated the IBSAs, and who ultimately resigned in August 2019—net income was higher than IBSA income only once from October 2016 through July 2019.

41.    The four months following Primavera's resignation, August 2019 through November 2019, fewer new IBSAs were reported, and, as a result, reported net income exceeded IBSA income for these four months.

42.    Plaintiffs believe that, without the IBSA income (which is a component of net income), TCA's aggregated net income during the entire period from October 2016 through November 2019, would have been negative.

43.     Consequently, Plaintiffs believe that Defendants knew they could not collect income from the IBSAs but continued to use them, and report them as income, to manufacture sources of income that would circumvent SEC and auditor scrutiny under generally accepted accounting principles and international accounting standards.

44.     By using these methods to inflate TCA's income, Defendants could then add the unrealized IBSA income to their monthly net asset value calculations ("NAV") and AUM and continue to report positive returns to investors, while masking the fact that: the majority of TCA's borrowers were in default; TCA's cash flow was low; and GCMF was experiencing negative months.

45.     For example, TCA's November 2019 NAV reflected AUM of $516 million, which equates to IBSA receivables comprising 34 percent.

46.     However, these IBSA receivables do not reflect loans that actually closed and where the IBSA fees were "wrapped" into the principal loan balance and subsequently charged interest.

47.     Day estimates that "wrapped" fees at end of 2017 amounted to $57.9 million, or 30 percent of then outstanding principal.

48.     As a result, Plaintiffs estimate that between 40 to 60 percent of AUM, or between $207.6 million to $309.6 million, was fraudulently misstated, between

9

2017 and 2019 period as a direct result of fraudulent IBSA fee reporting and related accounting.

*TCA's Inflated Income Forms the Basis for Reporting Performance and Management Fees*

49.     In addition to IBSA fees, TCA reported incentive fees for performance and management, or additional fees received by TCA that are contingent on a positive overall performance.

50.     Without the IBSA income, the net income would be negative, and no incentive fees would be available.

51.     Nevertheless, because TCA continued to falsely report IBSA fee income that inflated their NAV and AUM, it misrepresented to investors and regulators that TCA was performing positively, and incentive fees were payable.

52.     From October 2016 through November 2019, TCA reported total performance fees of approximately $27.5 million and total management fees of approximately $28.5 million.

53.     In the months during this period, where TCA reported IBSA fees exceeding net income, TCA reported $24 million in performance fees and $6.55 million in management fees.

54.     Notably, these incentive fees were substantially lower between August and December 2019, when net income exceeded IBSA income and TCA reported

negligible management fees and $3.5 million in performances fees, of which IBSA income accounted for approximately $1.66 million.

55.    Although TCA waived incentive fees totaling $11.4 million between October 2016 and November 2019, approximately $9.16 million were waived during months where net income was lower than IBSA income.

*Defendants Attempt to Evade Day's Increased Underwriting Scrutiny*

56.    After Day was hired and introduced more robust underwriting standards—requiring that borrowers must be able to service the loan debts and related fees—virtually all new loan production ceased in 2018.

57.    Day estimates that, under his direct supervision, only six or seven loans closed in 2018 and the same number of loans closed in 2019.

58.    This means that, between 2018 and 2019, less than ten percent of borrowers actually secured loans, and services (for which some proportion of the IBSA would be collectible) were only rendered to borrowers in four or five exceptional cases.

59.    Once it became clear to Day that TCA was reporting fee receivables for loans that were not funded (and would not generate any fees or result in default), he refused to accept these fees as part of the underwriting procedures.

60.    On numerous occasions, Day informed Fickling and Press that TCA could not report fees for these loans, but was falsely assured that they had corrected the

11

same.

61.    On one occasion, during a business dinner when Day asked Press for clarification about TCA's IBSA practices, Press accused Day of being an informant, seeking to "entrap" him and of wearing a wire before storming out.

62.    Instead of addressing Day's concerns, fees continued but omitted in new underwriting packages, resulting in more orphaned IBSAs.

63.    Further, Press used the law firm Lucosky Brookman, in which Press' brother-in-law, Seth Brookman is a named partner, to facilitate the closing of loans and related fee agreements.

64.    In several of these closings, Brookman served as the closing counsel for TCA Group while his partner, Joe Lucosky, served as counsel for the borrower.

65.    None of these closings were presented to Day or TCA's Credit and Investment Committee (TCIC).

66.    Indeed, Primavera's replacement, and the new Managing Director of TCA's New York office, William Haemmerle, admitted to Day that he would not have approved these transactions but for Press' insistence that they close before the end of 2019.

### *TCA's Audit Threatens to Reveal its Inflated Assets and Fraud*

67.    Grant Thornton was retained for TCA's fiscal year end audits from 2017

through 2019.

68.  Like Plaintiffs, Thornton was highly skeptical of the 2018 results and sought to investigate the IBSAs.

69.  To avoid this and cast its accounting irregularities as inadvertent, TCA admitted to an accounting error.

70.  Nevertheless, in November 2019 auditors sought information on what portion of the outstanding 2018 IBSA balance has been collected throughout 2019.

71.  In fact, upon information and belief, Thornton had 42 open issues, 11 of which related to the IBSA fee fraud.

72.  In preparing for the 2019 audit, Plaintiffs recognized that TCA had very few performing assets (approximately 30) despite reporting around $500 million in AUM.

73.  TCA's published November 2019 NAV reported an AUM of $516 million.

74.  As of November 2019, Plaintiffs believed that IBSAs accounted for over $207 million of the AUM, of which $178 million is reported IBSA income and the remainder are loans with "wrapped" IBSA fees.

75.  In addition to the IBSAs, Plaintiffs believe an additional 25 to 35 percent of TCA's $516 million AUM is non-performing, meaning the true value of the AUM would be closer to $150 million.

76.   In early January 2020, Plaintiffs estimated that GCMF had around $60 million in performing assets, yielding around 16 percent, or $9.6 million per annum (the "true yield").

77.   As a result, TCA's gross return as a percentage of its AUM, without IBSAs, equates to 1.92 percent, before expenses.

78.   Nevertheless, TCA consistently reported a yield of seven to eight percent in its monthly NAV and investor newsletters.

79.   The variance between TCA's purported seven to eight percent net annual return and TCA's actual 1.92 percent gross annual return is largely attributable to the IBSAs reported as "income."

80.   On February 28, 2020, Defendants claimed they were winding down GCMF.

*Defendants' Attempt to Evade Detection and Investor Redemptions by Commingling Assets and Liabilities Between Separate Domestic and International Funds*

81.   Upon information and belief, beginning in 2018 and prior to the purported GCMF wind-down, Defendants used the commingled monies between the foreign ICAV and domestic GCMF to effectuate fraudulent transactions between the two funds.

82.   For example, TCA created invoices each month for monthly services fees but did not send them to the invoiced companies and, consequently, the companies

were unaware of did not pay for service fees.

83.   Instead, TCA sent "copies" of these purported invoices—some of which were part of the GCMF portfolio—to the ICAV Fund Administrator, APEX, as proof of revenue to be reported as "fee income receivable."

84.   To the extent that these invoices were paid at all, they were paid from GCMF's IM bank account, pursuant to a supposed fraudulent "servicing agreement" between the ICAV and the GCMF.

85.   Defendants also commingled ICAV and GCMF investor funds.

86.   For example, in 2019, fees were reported to the GCMF, but the direct loan was never funded by the GCMF, it was funded by the ICAV.

87.   Plaintiff believes that Defendants commingled money between the ICAV and GCMF largely so that the GCMF could pay redemptions to investors when it lacked sufficient liquidity to do so from its own fund.

88.   Upon information and belief, Defendants sought to use the ICAV to avoid SEC detection, diverting the remaining assets of the GCMF, and it continues to operate; with TCA employees receiving bonuses and remaining employed even as the GCMF purportedly winds down.

*Plaintiff's Protected Activity*

89.   On December 24, 2019, Day submitted information on the SEC's Tips,

15

Complaints, and Referrals ("the TCR") system regarding conduct at TCA.

90.     On January 7, 2020, Day sent an email ("the Notification") notifying TCA, its directors, officers and other upper management personnel that he had filed the TCR and which also stated, in pertinent part:

> We have attempted to escalate our concerns, and seek remedial action, regarding the scale, scope and complexity of these matters by way of discussions with TCA Fund Management Group Corp Chairman and Founder Robert Press, Acting COO William Fickling, and Acting CEO Alyce Schreiber.   No adequate action has been taken by notified personnel to address our collective, material, and on-going concerns.
>
> In light of these areas of misconduct, and consistent with professional standards, compliance rules, and other legal and ethical obligations, this letter is being sent to all Board members, the head of investor relations, the head of TCA compliance, Executives and Officers, and others as deemed appropriate by us and our counsel.
>
> Also, given involvement in certain investor and audit meetings, and reliance on assertions of Mr Press, we are concerned that there may have been representations made to investors and/or auditors that are erroneous, and, therefore, a need to inform them of our on-going material concerns. We are asking permission to inform them, so please advise. We believe we have a fiduciary duty to these current and prospective investors, as well as the current auditors.

91.     The Notification included the contact information for the undersigned, as well as Plaintiffs' SEC counsel.

*Defendants' Retaliation*

92.    A few hours after Day sent Notification, Bruce Wookey, TCA's Independent Lead Director of TCA's Board, emailed Day demanding copies of the TCR and informing him that he would have his email and other connections to TCA disabled.

93.    In the same email, Wookey also made a reference to the health and welfare of Day's daughter which Day found to be inappropriate, given the context of the emails, and a veiled threat.

94.    When Day responded that Wookey should speak to the undersigned counsel, Wookey refused to do so until Day provided him with a certified copy of the TCR. Wookey informed him that the Notification was "grounds for dismissal & damages. Access to TCA resources can now, and will be withdrawn."

95.    Subsequently, Plaintiff's email and network access were withdrawn.

96.    Without system access, Plaintiff was locked out of work.

97.    On January 16, 2020, counsel for TCA confirmed that Plaintiff "[is] on full paid leave pending our investigation into the allegations."

98.    On February 5, 2020, counsel for Plaintiff informed TCA's counsel that this action constituted retaliation under the Dodd-Frank Act, 15 U.S.C. § 78u-6(h).

99.    On February 28, 2020, by a letter to Plaintiffs' counsel, TCA terminated Plaintiff.

*Damages*

100.   Had Plaintiff been permitted to remain employed at TCA—with full access to the tools necessary to perform his job—he would not only have received his salary, but would also have been eligible for 2019 bonuses and benefits such as retirement contributions and employer-sponsored health insurance for himself and his family.

101.   As a result of Defendants' conduct, Plaintiff's career has been derailed. He has and will continue to suffer lost wages and loss of other employment-benefits such as bonuses, health insurance, and retirement contributions.

102.   The conduct of Defendants has caused Plaintiff extraordinary emotional distress, emotional pain and suffering, inconvenience, humiliation and embarrassment.

103.   As a result of Defendants' conduct, Plaintiff has incurred not only the aforementioned damages but other damages, such as pre-paid childcare expenses, job search expenses, attorneys' fees and related expenses.

## COUNT I: RETALIATION IN VIOLATION OF THE DODD-FRANK ACT

104.   Plaintiff reasserts and incorporates the preceding Paragraphs of this Complaint as if fully set forth herein.

18

105.   Under the Dodd-Frank Act, 15 U.S.C. § 78u-6(h), no employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner  discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done in making disclosures that are protected under the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq.*

106.   Defendants took adverse action against Plaintiff because of his reports of conduct that violates Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j; and Rule 10b-5 of the Securities Exchange Act, 17 C.F.R. § 240.10b-5; Sections 206(1-2) and (4) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1-2) and (4), 80b-7, and Adviser's Act Rules 206(4)-7-8, 17 C.F.R. §§ 275.206(4)-7-8.

107.   Defendants retaliated against Plaintiff for the same by preventing him from accessing the tools necessary for him to perform his job, placing him on indefinite administrative leave, withholding compensation, and, ultimately, terminating him.

108.   Defendants' retaliatory conduct has adversely affected Plaintiff's employment.

109.   Defendants' retaliatory conduct might have dissuaded a reasonable person from making or supporting a report.

110.   The unlawful employment practices complained of above were intentional

and were performed by Defendants with malice or reckless indifference to the Dodd-Frank Act.

111.   As a direct and proximate result of Defendants' illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

### COUNT II: Retaliation in Violation of Florida Whistleblower Act

112.    Plaintiff reasserts and incorporates paragraphs 1-103 of this Complaint as if fully set forth herein.

113.   By questioning, refusing to adhere to, and seeking to correct TCA's accounting and underwriting practices, Plaintiff objected to or refused to participate in Defendants' conduct which was in violation of, or which Plaintiff reasonably believed was in violation of laws, rules or regulations including but not limited to: Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j; and Rule 10b-5 of the Securities Exchange Act, 17 C.F.R. § 240.10b-5; Sections 206(1-2) and (4) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1-2) and (4), 80b-7, and Adviser's Act Rules 206(4)-7-8, 17 C.F.R. §§ 275.206(4)-7-8.

114.   By filing a TCR, Plaintiff disclosed to the SEC that he believed Defendants

were in violation of multiple laws, rules, or regulations including but not limited to those identified in paragraph 118, above.

115.   By continuing to provide the SEC with information related to the TCR, Plaintiff participated in a SEC investigation or inquiry into TCA which eventually became the basis for an enforcement action by the SEC. *See SEC v. TCA Global Management Group Corp., et al.*, 1:20-cv-21964 (S.D.Fla. May, 11 2020).

116.   When Plaintiff informed Defendants that they he filed the TCR, Defendants immediately subjected him to adverse employment actions by preventing him from accessing the tools necessary for him to perform his job, placing him on indefinite administrative leave, withholding compensation, and, ultimately, terminating him.

117.   The actions of Defendants constitute unlawful retaliation in violation of the Florida Whistleblower Act ("FWA"), Fla. Stat. §§ 448.102(1-3).

118.   As a result, of Defendants' unlawful actions, Plaintiff has suffered emotional distress, inconvenience, humiliation, and other indignities.

119.   As a result of Defendants' violation of the FWA, Plaintiff is entitled to recover lost wages, benefits, compensatory damages, as well as equitable and injunctive relief, and reinstatement to the same position held before the retaliatory personnel action, or to an equivalent position and reinstatement of full fringe benefits and seniority rights.

120. Plaintiff seeks an award of reasonable attorney's fees, court costs, and expenses pursuant to F.S. §448.104.

## **Prayer for Relief**

WHEREFORE Plaintiff respectfully prays for relief as follows:

A.     For a trial by jury;

B.     For a finding that Defendants violated Plaintiff's rights as set forth herein;

C.     For a judgment in Plaintiff's favor for full front and back pay; compensatory damages for emotional distress; compensatory damages for loss of reputation, wages, and benefits; consequential damages; punitive damages; attorney fees, and litigation costs;

D.     Any such other and further relief as the Court deems proper and just.

## **JURY DEMAND**

Plaintiffs request a jury trial on all questions of fact raised by this Complaint.

[SIGNATURE BLOCK ON NEXT PAGE]

22

Respectfully submitted this 28th day of February, 2022.

<div style="margin-left: 3em;">

BUCKLEY BEAL, LLP

*s/ Edward D. Buckley*
Edward D. Buckley
*Pro Hac Vice Pending*
Georgia Bar No. 092750
edbuckley@buckleybeal.com
600 Peachtree Street NE, Suite 3900
Atlanta, Georgia  30308
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101

HESS LAW FIRM

*s/ Ephraim R. Hess*
Ephraim Roy Hess
Florida Bar No. 983100
erh@thehessfirm.com
erhpalaw@gmail.com
205 Davie Boulevard
Fort Lauderdale, Florida 33315
Telephone: (954) 585-8599

*Attorneys for Plaintiff*

</div>