**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-21964-CIV-ALTONAGA/Goodman**

**SECURITIES AND EXCHANGE**
**COMMISSION**,

       Plaintiff,

v.

**TCA FUND MANAGEMENT**
**GROUP CORP.**, *et al.*,

       Defendants.

_____/

**ORDER**

**THIS CAUSE** is before the Court on Receiver, Jonathan E. Perlman's Motion for Approval of Distribution Plan and First Interim Distribution [ECF No. 208] (hereinafter, the "Motion" or "Proposed Distribution Plan"), filed on February 28, 2022. The next day, the Joint Official Liquidators ("JOLs") of TCA Global Credit Fund, Ltd., Eleanor Fisher and Tammy Fu, filed an Unopposed Motion for Enlargement of Time to File Response in Opposition to Receiver's Motion for Approval of Distribution Plan and First Interim Distribution [ECF No. 212], which the Court granted. (*See* March 1, 2022 Order [ECF No. 213]). In a March 3, 2022 Order [ECF No. 215], the Court set an April 29, 2022 deadline for those wishing to file responses or objections to the Plan. (*See id.* 2). It also instructed the Receiver to publish the Motion, as well as all attached exhibits and the April 29, 2022 response deadline, on his website. (*See id.*). In this way, investors, financial institutions, and creditors would have "fair notice and a reasonable opportunity to respond" to the Plan. (*Id.* 1 (citation and quotation marks omitted)).

Respond they did.  The Court received seven responses or objections over the next 60 days.[1]  Those responding were: Caesarea Medical Electronics Holding (2000) Ltd. [ECF No. 228][2]; Paycation Travel, Inc., Xstream Travel, Inc. and David Manning [ECF No. 237] (hereinafter "Manning Objection"); Clearstream Banking, S.A. [ECF No. 238]; the JOLs [ECF No. 240]; AW Exports Pty Ltd., Warwick Broxom, and Jonathan James Kaufman [ECF No. 242] (hereinafter "Kaufman Objection"); Unpaid Subscribers Armand Zohari, Tritium Fund, Hsueh-Feng Tseng, and Fide Funds Growth [ECF No. 243] (hereinafter "Unpaid Subscribers Objection"); and Credit Suisse [ECF No. 244].  The Receiver filed a Reply in Support of First Interim Distribution Plan [ECF No. 263] on June 9, 2022.[3]  The Securities and Exchange Commission also filed a Reply [ECF No. 261], addressing only the JOLs' arguments.  (*See generally id*.).

On June 14, 2022, the Court issued an Order [ECF No. 267] setting a hearing on the Proposed Distribution Plan.  The hearing took place on July 11, 2022.  (*See* [ECF No. 279]).  Being fully informed of the relevant arguments, the underlying facts, and the applicable law, the Motion is granted in part.

## I. BACKGROUND

This case stems from an SEC investigation into the fraudulent revenue recognition practices of Defendants, TCA Fund Management Growth Corp. ("FMGC") and TCA Global Credit

---

[1] The Court also received an eighth objection from investor Peter van de Linde [ECF No. 270] on June 22, 2022 — long after the April 29 deadline.  The Court addresses the arguments contained in that untimely objection alongside the timely filed objections.

[2] Caesarea Medical Electronics Holdings' Objection concerned a discrete factual question about the size of Caesarea's investment.  (*See generally* Caesarea Objection).  The Receiver and Caesarea resolved the issue in the weeks before the Receiver filed his Reply (*see* Receiver's Reply 3), and so the objection is moot.

[3] The Court also permitted the JOLs to file a Sur-reply [ECF No. 268], addressing choice-of-law arguments made in the Receiver's Reply, to which the Receiver filed a Sur-sur-reply [ECF No. 274].

CASE NO. 20-21964-CIV-ALTONAGA/Goodman

Fund GP ("GP").  (*See* Mot. 3, 9).[4]  Defendants' operation employed a master-feeder investment

scheme involving TCA Global Credit Fund, LP ("Feeder Fund LP") and TCA Global Credit Fund,

Ltd. ("Feeder Fund Ltd.") (hereinafter collectively referred to as the "Feeder Funds"); TCA Global

Credit Master Fund, LP (the "Master Fund"); and TCA Global Lending Corp. ("Lending Corp.").[5]

(*See id*. 3).  On May 11, 2020, the SEC filed a Complaint [ECF No. 1] against the Receivership

Entities, alleging that Defendants were knowingly causing the Master Fund to report inflated

revenue numbers to investors.  (*See id.* ¶¶ 2–3).  By reporting fraudulently high revenue, Defendants

were tricking investors into believing they were enjoying impressive returns, when they were

actually taking heavy losses.  (*See id*. ¶¶ 32–33, 39–41, 43–46).

> **A.    Defendants' Scheme**

> 1.    <u>The Master-Feeder Structure</u>

A master-feeder investment structure involves two types of funds: feeder funds and a

master fund.  (*See* Mot. 3, 19).  Investors put their money directly into feeder funds, which then —

as their names suggest — "feed" the money into the master fund.  (*See id*. 3, 9).  The two Feeder

Funds here are Feeder Fund LP and Feeder Fund Ltd.  (*See id*. 3).  Both entities were formed in the

Cayman Islands in March 2010, and both "engaged in investment activities as . . . unregistered

private investment fund[s].  (*Id*. 6 (alteration added)).

There are two significant differences between these entities.  First, Feeder Fund LP is

organized as a limited partnership, and Feeder Fund Ltd. is not.  (*See id*.).  Second, Feeder Fund

---

[4] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[5] The Court refers to the Feeder Funds and Master Fund collectively as the "Funds."  Further, all named TCA entities — Defendants, the Funds, and Lending Corp. — are collectively referred to as the "Receivership Entities."

LP primarily serviced investors based in the United States, while Feeder Fund Ltd. primarily catered to investors based elsewhere.  (*See id*. 6–7).

The Receiver identified 1,485 investors in the Receivership Entities.  (*See* July 15, 2022 Status Report [ECF No. 281] ¶ 5).  These investors collectively placed $1,161,425,34 into the Feeder Funds.  (*See* Mot. 26).  In return, the Feeder Funds issued investors "securities in the form of . . . shares and limited partnership interests."  (Compl. ¶ 19 (alteration added)).

Once the Feeder Funds raised money, they fed that money into the Master Fund.  (*See* Mot. 9).  Feeder Fund LP invested its money into the Master Fund directly.  (*See id*. 6).  Feeder Fund Ltd., in contrast, would funnel the money through Lending Corp. first.  (*See id*. 8).  This reduced Feeder Fund Ltd.'s tax obligations.  (*See id*.).  Lending Corp. would then invest Feeder Fund Ltd.'s money into the Master Fund.  (*See id*.).  To summarize, the money flowed as follows:



2.      Inflated Revenue Reports

Once investors' money had passed to the Master Fund, Defendants FMGC and GP exercised significant control over how the Master Fund deployed the cash and, more importantly, how the Funds reported investment returns.  (*See* Compl. ¶ 20; Mot. 8).  They had strong incentives to do so.  FMGC, the Funds' investment advisor, received compensation based on the Funds' net asset value ("NAV").  (*See* Mot. 9).  The greater the asset value, the greater the compensation.  (*See*

*id*.).  Similarly, the compensation for GP, general partner of the Master Fund and Feeder Fund LP, turned on the Master Fund's reported profitability.  (*See id*.).

The Master Fund tried to generate returns for investors through two lines of business.  First, beginning in 2010, it provided financing to small and medium sized businesses through loans and equity investments.  (*See id*.).  For loans, it would insist on interest rates of between 12 and 18 percent annually, as well as other fees due upon closing and over the course of the loan.  (*See* Compl. ¶ 22).  Interested borrowers would sign a term sheet, after which FMGC's underwriting department would provide due diligence on the pending transaction.  (*See id*. ¶ 23).  If FMGC gave its approval, the transaction would close, and the Master Fund would transfer the agreed-upon loan.  (*See id*. ¶ 24).

Unbeknownst to investors, Defendants did not wait until the borrower paid back the loan principal, interest, and related fees before recognizing all three as earned revenue.  (*See* Mot. 9).  Defendants instead caused the Funds to book these expected future payments as revenue upon execution of the non-binding term sheet, before the loan had even closed.  (*See id*.).  In many cases, loans did not close.  In others, loans closed, but borrowers lacked the ability to make payments.  (*See id*.).

Because the Master Fund was prematurely booking *anticipated* revenue as *earned* revenue, investors were given a distorted picture of how the Funds were doing.  They could not have known that the Master Fund only collected a portion of the loan revenue it reported.  (*See* Compl. ¶¶ 30–31, 34).  With many loans outstanding, mired in litigation, or never having closed in the first place, a significant gap emerged between the Funds' reported revenue and their actual revenue.  (*See id*. ¶ 44).  This was great for Defendants, for the inflated revenue numbers artificially increased the Funds' reported profits and NAV, thereby increasing their compensation.  (*See* Mot. 9).  But

investors remained ignorant of the "skyrocketing losses" that characterized the Funds' true performance. (*Id.* 13).

In 2016, the loan business started to unravel. (*See* Compl. ¶¶ 32–34). The SEC had become suspicious of Defendants' revenue reporting practices and launched an investigation. (*See* Mot. 14). The disparity between reported revenues and actual revenues had grown ever larger, and the prospect of having to report an operating loss for the year 2015 loomed over Defendants. (*See* Compl. ¶¶ 32–33). An operating loss would have contradicted the interim reports Defendants sent investors over the course of 2015, all of which suggested that the Funds were performing well. (*See id.*).

To avoid reporting a massive operating loss, FMGC executed a promissory note, assigning the Master Fund $34.3 million in income that it had received or planned to receive. (*See id.* ¶ 33). The Master Fund booked the revenue but never reported that the note offset losses incurred in its loan business. (*See id.*). This "had the effect of papering over the Funds' 2015 losses." (*Id.*). Defendants thus avoided reporting the operating loss, at least for the time being. At the same time, the close call apparently signaled that it was time to exit the loan business.[6] From there, Defendants pivoted to a new line of business: investment banking. (*See* Mot. 10, 14).

From mid-2016 through 2019, the Master Fund pitched agreements ("IB Agreements") to companies that needed investment banking services. (*See id.* 10). Facially, the IB Agreements were straightforward. The Master Fund and Defendants would track down merger-and-acquisition opportunities, generate business plans and financial models, and provide other such services to clients who promised to pay service fees in exchange. (*See id.*). These fees ranged from hundreds of thousands to millions of dollars. (*See id.*). Two problems quickly emerged.

_____

[6] By the start of 2017, Defendants also stopped prematurely booking loan fees as revenue. (*See id.* ¶ 34).

First, Defendants were almost completely unqualified to provide investment banking services. (*See id*. 12). They had "no employees" with the requisite "experience, knowledge or licensing" to provide such services. (*Id*.). Defendants would occasionally draft a "scope of work" to present to a client. (*Id*. (quotation marks omitted)). But these were typically illusory. Defendants only provided actual investment banking services in "four or five cases." (*Id*.).

Second, as with the loan agreements, Defendants caused the Funds to report revenue from the IB Agreements that simply did not exist. (*See id*. 12–13). Upon execution of the IB Agreements, Defendants booked the fees they *would have received* had they provided the envisioned services — which they typically did not — and had the client paid — which it rarely did. (*See id*.). Predictably, the reported revenue and actual revenue garnered from IB Agreements diverged significantly. (*See id*.). Even in those cases when Defendants did provide investment banking services, their clients were often distressed or early-stage companies with no means of paying the agreed-upon fees. (*See id*. 12).

The net result of Defendants' foray into investment banking closely resembled what had happened with their loan business. (*See id*. 12–13). The Funds continued to lose money, but they nonetheless reported positive returns. (*See id*.). Investors thought the IB Agreements were generating significant revenue each year from 2016 to 2019. (*See id*. 13). Defendants used those false numbers to justify their high compensation.[7] (*See id*. 9). But Defendants could not keep the charade going indefinitely, and eventually their house of cards collapsed.

The master-feeder structure of the Funds' operation meant the Feeder Funds typically did not have enough cash on hand to satisfy investors' redemption or withdrawal requests. (*See id*. 22–

---

[7] By November 2019, the fraudulent recognition of revenue under the IB Agreements resulted in a reported NAV that exceeded the actual NAV by at least $130 million, as well as $155 million in improperly recognized revenue. (*See* Compl. ¶ 38).

23).  Cash assets lay with the Master Fund.  (*See id*. 23).  When one of the Feeder Funds received a redemption or withdrawal request, the Master Fund was supposed to provide the Feeder Fund with sufficient liquidity to satisfy the request.  (*See id*.).

By January 2020, the Funds' losses had become so pronounced — and the disparity between the reported and actual NAV so great — that the Master Fund could no longer satisfy redemption or withdrawal requests.  (*See* Compl. ¶ 46).  The value of investors' requests exceeded the Funds' total cash assets, leaving Defendants with no option but to admit that the Funds were short on cash.  (*See id*.).  On January 21, 2020, the Feeder Funds sent letters to investors, informing them not only that they could not pay out all redemption and withdrawal requests, but also that it was no longer feasible for the Funds to continue investing.  (*See id*.).  The party was over, and the Receivership Entities began to wind up their affairs.  (*See id*.).

## B.    Receivership Appointment

The SEC filed its Complaint on May 11, 2020.  (*See generally* Compl.).  That same day, the Court appointed the Receiver and froze the Receivership Entities' assets (the "Receivership Assets") in a constructive trust.  (*See* May 11, 2020 Order [ECF No. 5] 1).  The Court empowered the Receiver to "use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entities . . . (collectively, the 'Receivership Estates')[;]" to "take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Entities[;]" and to "use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable[.]"  (*Id*. ¶ 7 (alterations added)).

The Receiver launched an investigation into the Receivership Entities' pre-Receivership business practices and confirmed the allegations in the SEC's Complaint.  (*See* Mot. 11).  He also

compiled a summary of all the investors who put their money into the Feeder Funds (*see id*. 26–34), as well as the state of the Receivership Assets (*see id*. 23–26).

    1.   <u>Investors</u>

"The Receiver identified [1,485] investors in the Receivership Entities that collectively invested $1,161,425,343 through the Feeder Funds since their inception." (*Id*. 26 (alteration added)).[8]  Five hundred and sixty-five of these investors (the "Net Winners") withdrew *more* than they initially invested.  (*See* July 15, 2022 Status Report ¶ 8).  The Net Winners collectively invested $485,907,849 in subscriptions and withdrew $563,602,432 in redemptions.  (*See* Mot. 26).  That constitutes an aggregate profit of $77,694,583.  (*See id*.).

By contrast, the remaining 920 investors (the "Net Losers") invested more money than they have withdrawn on an aggregate basis.  (*See* July 15, 2022 Status Report ¶¶ 5–7).  They collectively invested $675,517,494 in subscriptions and withdrew $296,162,750 in redemptions, for an aggregate loss of $379,354,744.  (*See* Mot. 27).  Among the Net Losers are two sub-classes of non-U.S. investors.  The first consists of the Unpaid Subscribers, a class of investors who paid subscription money to Feeder Fund Ltd. but did not receive value for the subscription payments.  (*See id*. 31–33).  Their funds remain held in trust by the Receivership Entities.  (*See id*. 31).  The second consists of the Redemption Claimants, who, more than a month before the Feeder Funds sent their winding-up letters to investors, requested redemption of 5,300 equity shares, valued at $44,201,902.  (*See id*. 34).

---

[8] When the Receiver filed the Motion on February 28, 2022, he identified 1,461 investors.  (*See* Mot. 26).  On July 15, 2022, the Receiver advised that he had identified additional investors in the intervening months, bringing the total to 1,485.  (*See* July 15, 2022 Status Report ¶ 5).  Notwithstanding these changes — which are likely to continue as the Receiver uncovers more investors — the Court treats the July 15, 2022 numbers as the most accurate for the purpose of evaluating the Proposed Distribution Plan.

2.      Receivership Assets

At the time of the Complaint, the state of the Funds was "grim." (Compl. ¶ 8). When the Court appointed the Receiver, the Receivership Entities only held $287,683 in cash. (*See* Mot. 23). In the two years that have since passed, things have improved. When the Receiver filed his Motion, the Receivership Entities' bank accounts had a combined balance of $67,008,922. (*See id.*). The Receiver attributes the interim gains to "successful recoveries of monies, sale of non-cash assets, as well as institution and resolution of litigation matters." (*Id.*).

The Receivership Estates also possess four types of non-cash assets. (*See id.* 24–26). First, and most valuable, are the businesses that the Master Fund owns through special purpose vehicles ("SPVs"). (*See id.* 24). These date back to the Master Fund's loan scheme. When a borrower could not repay its loans, interest, or related fees, the Master Fund would initiate a lawsuit, sometimes resulting in a foreclosure sale of the borrower's assets. (*See id.*). The Master Fund would then transfer the foreclosed assets to a new entity it owned, and the foreclosed-upon business would resume operations under the Master Fund. (*See id.*). The resale of SPV assets has proven key to increasing the Receivership Estate's cash holdings.[9] (*See id.*).

Second, the Receiver also lists the Receivership Estates' loan portfolio as a significant non-cash asset. (*See id.*). When the Receiver was appointed, the portfolio, "which has a face value exceeding $110 million[;]" only had two "performing" loans, as well as two others that "were paying regularly, but far less than the monthly amount due under their loan agreements." (*Id.* 24–25 (alteration added)). The Receiver has prosecuted collection actions against defaulting borrowers to generate cash, but he now seeks to simply sell the balance of the portfolio. (*See id.* 25).

---

[9] For example, much of the Receivership Entities' $67,008,922 bank account balance is attributable to one May 2021 sale of the assets of one SPV, which netted the Receivership Estates $52 million. (*See* Mot. 24).

Third, the Receiver states that he is identifying and filing claims against third parties liable to the Receivership Estates. (*See id*.). He does not estimate how much these claims are worth. (*See id*.). Regardless, proceeds obtained from these claims will be added to the Receivership Estates' bank accounts and distributed to investors. (*See id*.).

Fourth, the Receiver notes a September 30, 2021 settlement agreement between the SEC and FMGC's former officers and directors, proceeds of which will go to the Receivership Estates. (*See id*. 25–26). Under the agreement, founder and CEO Robert Press is slated to pay $5,457,294. (*See id*. 25). Former Chief Portfolio Manager Donna Silverman will also pay $50,000. (*See id*.).

### C. Proposed Distribution Plan and Initial Distribution

On February 28, 2022, the Receiver submitted the Proposed Distribution Plan. (*See generally* Mot.). The Plan prioritizes distributions to 872 of the 920 Net Losers (the "Unsubordinated Net Losers") and subordinates the other 48 (the "Subordinated Net Losers").[10] (*See id*. 26–27, 30–31; *see also* July 15, 2022 Status Report ¶¶ 5–7). Two hundred and eighty-three of the Unsubordinated Net Losers have already been able to recoup some of their losses through withdrawals or redemptions, but 589 have yet to recover anything. (*See generally* July 15, 2022 Status Report, Ex. A, Schedule of Distribution to Unsubordinated Net Losers [ECF No. 281-1]).

The Motion includes a proposal for an Initial Distribution under the Plan. (*See generally* Mot.). The Initial Distribution would distribute $55,452,651 on a pro-rata basis to the 764 Unsubordinated Net Losers whose losses exceed 76.95% of their aggregate cash investment. (*See*

---

[10] The Subordinated Net Losers invested through financial institutions with which the Receiver has been in contact. (*See* Mot. 30–31). Yet, the Receiver reports that the financial institutions have been either unwilling or unable to provide "complete information" about the Subordinated Net Losers, rendering it impossible to reconcile their reported transactions with the underlying investors. (*Id*.). He thus proposes subordinating their claims to those of the Unsubordinated Net Losers. (*See id*.). In his Reply, the Receiver agrees to allow Subordinated Net Losers to cure their subordinated status on a case-by-case basis, provided they furnish sufficient documentation to verify their claims. (*See* Receiver's Reply 20–21).

*id*. 27; July 15, 2022 Status Report ¶ 5).  Among those who would receive funds are the 589 investors who have not yet recovered any of their investments.  (*See* July 15, 2022 Status Report ¶¶ 4–5; *see generally* Schedule of Distribution to Unsubordinated Net Losers).  They would receive a distribution equal to 23.05% of their actual cash loss.  (*See* July 15, 2022 Status Report ¶ 5).

The remaining 175 would receive a distribution that, combined with their previous redemptions, would restore 23.05% of their investments.  (*See id*.).  That way, after the proposed Initial Distribution, all 872 Unsubordinated Net Losers would have recouped at least 23.05% of their investments.  (*See id*. ¶¶ 5–6).  To summarize, the investors' pre- and post-distribution recovery percentages break down as follows under the Proposed Distribution Plan:

| Class | Sub-Class | Percentage Recovered (Pre-Distribution) | Number of Investors | Distribution | Percentage Recovered (Post-Distribution) |
|---|---|---|---|---|---|
| Net Winners | N/A | x > 100% | 565 | $0 | x > 100% |
| Net Losers | Subordinated Net Losers | x < 100% | 48 | $0 | x < 100% |
| | Unsubordinated Net Losers | 23.05% ≤ x < 100% | 108 | $0 | 23.05% ≤ x < 100% |
| | | 0% ≤ x < 23.05% | 764 | $55,452,651 | 23.05% |

(*See id*. ¶¶ 5–8).

## II.  LEGAL STANDARD

District courts have "broad powers and wide discretion to determine relief in an equity receivership." *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) (citations omitted).  That discretion "derives from the inherent powers of an equity court to fashion relief." *Id*. (citation omitted).  Consequently, any "action by a trial court in supervising an equity receivership is

committed to [her] sound discretion and will not be disturbed unless there is a clear showing of abuse." *Bendall v. Lancer Mgmt. Grp., LLC*, 523 F. App'x 554, 557 (11th Cir. 2013) (alteration added; citations and quotation marks omitted).

In receivership cases, courts need only determine that a proposed distribution plan is "fair and reasonable" under the circumstances. *CFTC v. Walsh*, 712 F.3d 735, 754 (2d Cir. 2013); *see also S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991). The plan must be crafted "equitably and fairly, with similarly-situated investors or customers treated alike." *S.E.C. v. Credit Bancorp, Ltd.*, 99 Civ. 11395, 2000 WL 1752979, at *13 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002). As the Supreme Court has long recognized, "equality is equity[.]" *Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (alteration added).

## III.    DISCUSSION

### A.    Choice of Law

Before considering the substance of the Receiver's Proposed Distribution Plan, the Court must decide what law governs. The Receiver seeks to apply federal principles of equity. (*See generally* Mot.). The JOLs argue that at least for Feeder Fund Ltd. investors — nearly all of whom are based outside the United States — Cayman law must apply instead. (*See generally* JOL Objection). They advocate for a version of the distribution scheme adopted in *In re Ascot Fund Ltd.*, 603 B.R. 271 (Bankr. S.D.N.Y. 2019), a case in which a bankruptcy court applied Cayman law to the distribution of foreign investors' assets and domestic law to that of American investors' assets. (*See* JOL Objection ¶¶ 38–42). This would involve bifurcating the Receivership Assets and making parallel distributions governed by two sets of law. (*See id.* ¶¶ 40–41). In the alternative, they request that the Court deny the Motion and direct the Receiver and the JOLs to cooperate on formulating a mutually agreeable plan. (*See id.* ¶ 49).

The two sets of law generate substantially different results.  Under Cayman law, 31 Unpaid Subscribers and 50 investors who sought to redeem their equity interests in Feeder Fund Ltd. prior to the suspension of redemptions would apparently be deemed creditors.  (*See id.* ¶¶ 13–16; Receiver's Reply 4).  That designation would give them priority over the other Net Losers, who would be relegated to splitting whatever scraps remained once the 81 "creditors" were paid in full.  (*See* JOL Objection ¶¶ 13–16).

In stark contrast, the Receiver proposes a single scheme that distributes funds to all unsubordinated investors on a *pro rata*, rising tide basis.  (*See generally* Mot.).  The Proposed Distribution Plan would distribute funds to 764 Unsubordinated Net Losers.  (*See* July 15, 2022 Status Report ¶ 5).  Under the Plan, no Unsubordinated Net Loser would lose more than 76.95% of its initial investment after the First Interim Distribution.  (*See id.*).

The JOLs acknowledge that district courts typically apply federal equity principles when evaluating proposed distribution plans, especially when the entities involved are all American.  (*See* JOL Objection ¶ 2).  But here, they stress that Feeder Fund Ltd. is a Cayman Islands entity that is the subject of a liquidation proceeding before the Grand Court of the Cayman Islands, the purpose of which is to return funds to investors who are largely outside the United States.  (*See id.* ¶¶ 1–2, 4–5).  The Court has formally recognized these proceedings.  (*See generally In re TCA Global Credit Fund Ltd.*, 1:21-cv-21905, Order Granting Recognition of Foreign Nonmain Proceeding and Certain Related Relief [ECF No. 8] filed June 4, 2021 (S.D. Fla. 2021) (hereinafter "Recognition Order").  The JOLs argue that these facts compel the application of Cayman law.  (*See id.* ¶¶ 7–10).

CASE NO. 20-21964-CIV-ALTONAGA/Goodman

The Receiver and the SEC disagree.  (*See* Receiver's Reply 3–18; SEC's Reply).  So does the Court.[11]

The JOLs stress that "'equity must follow, or in other words, be subordinate to the law.'" (JOL Objection ¶ 7 (quoting *Magniac v. Thomson*, 15 How. (56 U.S.) 281, 302 (1853))).  Courts of equity may not "disregard statutory and constitutional requirements and provisions" willy-nilly. *Hedges v. Dixon Cnty.*, 150 U.S. 182, 192 (1893).  The JOLs argue that deference to statutes includes, in some cases, deference to foreign statutes.  (*See* JOL Objection ¶¶ 8–10, 20–23).  They give four arguments for deferring to Cayman statutes here.

### 1.   International Comity

International comity is "an abstention doctrine that reflects the extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed operate within the dominion of another nation."  *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1030 (11th Cir. 2014) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163 (1895) (quotation marks omitted)).  Crucially, comity is "not a rule of law, but one of practice, convenience, and expediency."  *Id.* (citation and quotation marks omitted).  It may be "more than mere courtesy and accommodation," but it "does not achieve the force of an imperative or obligation."  *Id.* (citation and quotation marks omitted).

Whether to grant comity is soundly within the Court's discretion.  *See In re Neves*, 783 F. App'x 995, 996 (11th Cir. 2019); *Leader Glob. Sols. LLC v. Yankelewitz*, 762 F. App'x 629, 634 (11th Cir. 2019); *Seguros del Estado, S.A. v. Sci. Games, Inc.*, 262 F.3d 1164, 1169 (11th Cir. 2001).  Comity is "[m]ost frequently . . . applied retrospectively, when courts consider whether to

---

[11] While the Court independently concludes that Cayman law is inapposite, it also notes that district courts generally act within their discretion when they defer to a receiver's expertise.  *See S.E.C. v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986).  It is thus significant that the Receiver adamantly opposes applying Cayman law here.  (*See* Receiver's Reply 3–18; Sur-sur-reply).

respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings." *GDG Acquisitions, LLC*, 749 F.3d at 1030 (alterations added; citation omitted). Before invoking comity, courts weigh "the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1053 (5th Cir. 2012) (citation and quotation marks omitted).

On June 4, 2021, the Court entered an Order in case number 1:21-cv-21905 that formally recognized the liquidation proceedings before the Grand Court of the Cayman Islands. (*See generally* Recognition Order). The JOLs stress that under Chapter 15 of the Bankruptcy Code, "a court in the United States shall grant comity or cooperation to the foreign representative" of a foreign proceeding that has been formally recognized. (*See* JOL Objection ¶ 26 (quoting 11 U.S.C. § 1509(b)(3))). True, but recognition of foreign proceedings under Chapter 15 does not strip the Court of discretion as to which law applies. *See In re Black Gold S.A.R.L.*, 635 B.R. 517, 532 (B.A.P. 9th Cir. 2022) ("After a petition for recognition has been granted, the court has a considerable amount of discretion." (citation omitted)); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) (noting that relief under Chapter 15 "is largely discretionary and turns on subjective factors that embody principles of comity" (citations omitted)).

Notably, subsection 1509(b) — which prefaces paragraph 1509(b)(3) — states that the Court may impose "any limitations" it so chooses on comity, so long as those limitations are "consistent with the policy" of Chapter 15. 11 U.S.C. § 1509(b). Those policies include protection of "the interests of *all* creditors, and other interested entities, including the debtor[.]" *Id.* §

1501(a)(3) (alteration and emphasis added).  The JOLs ask the Court, in contravention of this policy, to sacrifice the interests of the whole in service of the few.

There is no dispute that Chapter 15 centers comity as "a principal objective." *In re Vitro S.A.B. de CV*, 701 F.3d at 1044.  But it does not require application of foreign law in all instances, especially when doing so would compel a result not "comparable" to that reached by federal law. *Id.* (citations and quotation marks omitted).  Here, the JOLs would have the Court elevate a small group of investors to the status of creditors, giving them preference over investors who would otherwise "occup[y] the same legal position" and receive equal treatment.  *Elliot*, 953 F.2d at 1570 (alteration added; citation omitted).  That shift might benefit the 81 investors fortunate enough to be deemed creditors, but it would leave most investors in a far worse position than if the Court applies federal equity principles.  (*See* Receiver's Reply 3).

In other words, the relief the JOLs seek under Cayman law is not "comparable" to anything required by federal equity principles.  *In re Vitro S.A.B. de CV*, 701 F.3d at 1044 (citations and quotation marks omitted).  Quite the contrary.  It disregards equity's lodestar — "equality[,]" *Cunningham*, 265 U.S. at 13 (alteration added); and undercuts the principal "goal" of equity receiverships, which "is to grant fair relief to as many investors as possible[,]" *S.E.C. v. Torchia*, 922 F.3d 1307, 1311 (11th Cir. 2019) (alteration added; citation omitted).  That alone militates against application of Cayman law.

The Court further notes that while it retains discretion to apply federal law instead of foreign law in any instance,[12] foreign law is *particularly* inappropriate when it would cause undue

---

[12] *See Sanchez Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1322 (S.D. Fla. 2009) ("[C]omity[,] . . . though often couched in the language of mutual respect and obligation, is most accurately described as a matter of grace." (alterations added; citation omitted)); *In re Kandu*, 315 B.R. 123, 133 (Bankr. W.D. Wash. 2004) ("Comity is voluntary. . . . [The] assertion that comity is mandatory is simply not supported by case law." (alterations added; citation omitted)).

injury to American citizens or hamper domestic public policy. *See Hilton*, 159 U.S. at 164 ("[N]o nation will suffer the laws of another to interfere with her own to the injury of her citizens[.]" (alterations added; citations and quotation marks omitted)); *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."); *In re Kandu*, 315 B.R. at 133 ("Although there may be a preference for comity when the laws of nations are in alignment, no such preference exists when the laws of a foreign nation are contrary to the sovereign's policy or prejudicial to its interests." (citation omitted)). If the Court applies Cayman law, a small number of foreign investors would siphon much of the Receivership Assets, leaving far less for the remaining Net Losers, the bulk of whom are based in the United States.[13] (*See* Receiver's Reply 4). Federal equity principles do not "require[] a district court to favor one class of investors over another in an equity receivership compensating fraud victims." *U.S. S.E.C. v. Quan*, 870 F.3d 754, 762–63 (8th Cir. 2017) (alteration added; footnote call number omitted). The Court thus declines to do so here, Cayman law to the contrary notwithstanding.

Finally, it bears repeating that when the Court issued the Recognition Order last year, it recognized the winding up proceeding in the Cayman Islands as a foreign *nonmain* proceeding. (*See generally* Recognition Order). To be sure, there are cases in which courts award representatives involved in foreign nonmain proceedings similar — or even the same — relief as would be appropriate if they were operating in main proceedings. *See In re Serviços De Petróleo*

---

[13] This problem would persist even if the Court bifurcated the Receivership Assets, as the bankruptcy court did in *In re Ascot Fund Ltd*, 603 B.R. at 284. If the Court ordered parallel distributions — with the Feeder Fund Ltd. half governed by Cayman law and the Feeder Fund LP half governed by federal equity principles — 81 investors would take the entire Feeder Fund Ltd. half, leaving nothing for the other foreign investors and dramatically shrinking the pie for the domestic investors, who would have to split the other half. Under federal equity principles, by contrast, under the Plan, the Receivership Assets are split evenly among *all* similarly situated investors, regardless of nationality.

*Constellation S.A.*, 613 B.R. 497, 513 (Bankr. S.D.N.Y. 2020).  In *this* instance, however, "the Court believes that only strictly limited, conditional relief is warranted under its holding of foreign nonmain recognition."  *In re Stanford Int'l Bank, Ltd.*, No. 3:09-cv-0721, 2012 WL 13093940, at *26 (N.D. Tex. July 30, 2012).  Here, the Recognition Order granted the JOLs "a forum . . . to be heard on any matters that have the requisite effect on the Debtor in the Chapter 15 Case and/or the Receivership Case[.]"  (Recognition Order ¶ I (alterations added)).  Mindful of Chapter 15's emphasis on comity, *see* 11 U.S.C. § 1509(b)(3), the Court has given the JOLs ample opportunity to voice their concerns about the Proposed Distribution Plan.

But the Recognition Order also made explicit that the Court's recognition of the Cayman proceeding did not disturb "the rights, duties and responsibilities imposed upon [the Receiver] by orders of the Court[.]"  (Recognition Order ¶ I (alterations added)).  These include the direction "to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property[.]"  (May 11, 2022 Order ¶ 46 (alteration added)).  Nothing in the Recognition Order entitles the JOLs to undercut this direction through forced imposition of an alternative distribution scheme that would produce a wildly unequal and unfair result.  The Court thus declines to apply Cayman law here.

### 2.     The Internal Affairs Doctrine

The JOLs also argue that the "internal affairs doctrine" requires application of Cayman law.  (JOL Objection ¶¶ 27–29).  The internal affairs doctrine "is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs — matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders — because otherwise a corporation could be faced with conflicting demands."  *Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982) (citation omitted).  The doctrine applies

not only to domestic choice-of-law questions, but also internationally. *See, e.g.*, *Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1133 (11th Cir. 2020) (invoking the internal affairs doctrine to apply Israeli law instead of Florida law).

Feeder Fund Ltd. is a Cayman entity. (*See* JOL Objection ¶ 27). The foreign investors are stakeholders of that entity. (*See id.*). According to the internal affairs doctrine, issues involving the relationship between an entity and its stakeholders are best resolved under the laws of the State — or in this case, country — where the entity was formed. *See Mansfield Hardwood Lumber Co. v. Johnson*, 268 F.2d 317, 320 (5th Cir. 1959). Otherwise, different legal schema may foist "conflicting demands" on the entity. *Edgar*, 457 U.S. at 645 (citation omitted). Avoiding the problem of "conflicting demands" is "[t]he purpose of the internal affairs doctrine[.]" *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 194 (S.D.N.Y. 2006) (alterations added; quoting *Edgar*, 457 U.S. at 645).

The JOLs assert that the Proposed Distribution Plan concerns the relationship between the foreign investors and a Cayman entity, so Cayman law must apply. (*See* JOL Objection ¶¶ 27, 29). This argument does not persuade. The JOLs cite no cases — and the Court is aware of none — invoking the internal affairs doctrine to justify application of foreign law to an equity receiver's proposed distribution plan.[14]   (*See generally* JOL Objection; Sur-reply). Doing so here would extend the doctrine beyond its relatively modest purpose.

---

[14] To the contrary, courts have rejected arguments that federal law must yield to the law of a receivership entity's home state. *See, e.g.*, *United States v. Vanguard Inv. Co.*, 6 F.3d 222, 226 (4th Cir. 1993) ("Given its equitable nature and purposes, a district court supervising . . . a receivership has the discretionary power to deny [state law] equitable remedies as inimical to receivership purposes even though they are or might be warranted under controlling law." (alterations added)); *S.E.C. v. Wealth Mgmt. LLC*, No. 09-C-506, 2009 WL 10699917, at *3–4 (E.D. Wis. Nov. 20, 2009) (declining to apply Wisconsin law to a distribution plan over the objection of investors, who argued state law would afford them priority as creditors).

For the internal affairs doctrine to apply, the Plan would have to force Feeder Fund Ltd. to do something that might subject it or its directors to conflicting demands under federal law and Cayman law. *See Pension Comm. of the Univ. of Montreal Pension*, 446 F. Supp. 2d at 194 (declining to extend the internal affairs doctrine because there was no risk of a defunct hedge fund or its directors being subjected to conflicting demands). Not so here. The Proposed Distribution Plan seeks only to distribute assets that the Court has frozen in a constructive trust. (*See* May 11, 2020 Order ¶ 3).

The JOLs acknowledge that this would be a *direct* distribution from the Master Fund to investors. (*See* JOL Objection ¶ 13). That means the Proposed Distribution Plan would not require Feeder Fund Ltd. to do anything. It is thus unsurprising that the JOLs make no attempt to show that the Plan creates any risk of conflicting demands for Feeder Fund Ltd. or its management.[15] (*See generally id.*; Sur-reply). The Court will not extend the internal affairs doctrine under these circumstances, which do not implicate the purpose of the doctrine.

### 3.    Federal Common Law

The JOLs also suggest that "recent years" demonstrate a "clear trend" of courts disregarding federal common law unless "a unique or overriding federal interest" requires otherwise. (JOL Objection ¶ 30). They emphasize the Supreme Court's decision in *Rodriguez v. F.D.I.C.*, which held that in "the absence of congressional authorization, common lawmaking" is

---

[15] Even if the Proposed Distribution Plan required Feeder Fund Ltd. to do something that upset the relationship between the company and the foreign investors under Cayman law, Feeder Fund Ltd.'s Articles of Association explicitly allow the company to suspend investors' redemption rights if "necessary to do so to comply with anti-money laundering laws and regulations or any other legal requirement applicable to . . . the Master Fund[.]"  (Pearson Decl., Ex. A, Feeder Fund Ltd. Articles of Association [ECF No. 241–1] ¶ 62 (alterations added)). In other words, the foreign investors' redemption rights can be subjugated to federal law, for federal law governs the Master Fund. That would resolve the problem of conflicting demands in favor of federal law, if any were to arise.

only appropriate when "necessary to protect uniquely federal interests." 140 S. Ct. 713, 717 (2020) (citations and quotation marks omitted). They insist no such interests apply here, so the Court should apply Cayman statutes governing liquidation instead of equity principles found in federal common law. (*See* JOL Objection ¶¶ 33–36).

The JOLs' reliance on *Rodriguez* is misplaced for two reasons.[16] First, *Rodriguez* explicitly distinguished between established applications of federal common law, like "admiralty disputes and certain controversies between States[,]" and "new area[s] for common lawmaking," such as how tax refunds should be distributed. 140 S. Ct. at 716–17 (alterations added; citations omitted). Only the latter require courts to first identify a federal interest. *See id*. at 717. The issue here — whether to apply federal or Cayman law in evaluating an equity receiver's proposed distribution plan — undoubtedly falls into the former category. Federal common law has long applied to "international disputes implicating . . . our relations with foreign nations[.]" *Tex. Indus. v. Radcliff Materials*, 451 U.S. 630, 641 (1981) (alterations added; citation and footnote call numbers omitted). *Rodriguez* did not disturb that practice.

Second, *Rodriguez* may have affirmed that a federal interest is a prerequisite to common lawmaking "[i]n the absence of congressional authorization," 140 S. Ct. at 717 (alteration added; citation omitted); but "federal courts retain authority . . . to craft and apply . . . federal common law in those areas in which courts have express congressional authorization to devise a body of law[,]" *Al-Bihani v. Obama*, 619 F.3d 1, 18 n.6 (D.C. Cir. 2010) (collecting cases; alterations added; quotation marks omitted). Congress has so authorized here. Section 78u of Chapter 15 of the

---

[16] The JOLs stress that *Rodriguez* is not a one-off case but rather is the zenith of a 25-year trend of courts, including the Supreme Court, cabining the application of federal common law. (*See* Sur-reply 7). The Court acknowledges as much. When the Court refers to *Rodriguez*, it is mindful not just of the discrete facts of that case but also of the broader choice-of-law principles the Supreme Court elucidated and applied there. *See* 140 S. Ct. at 716–17 (collecting cases).

United States Code provides that when the SEC initiates an action "under any provision of the securities laws,"[17] it is empowered to seek — and the Court is empowered to grant — "any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).

According to the JOLs, section 78u is too tangentially related to equity receiverships or the distribution of investor funds to constitute congressional authorization.  (*See* Sur-reply 8).  This argument rests on a weak foundation.  The JOLs cite no authority to suggest that section 78u is insufficiently directed toward the distribution of funds in an equity receivership case, nor do they articulate any test or standard delineating how on-point a statute must be for the application of common law to be deemed authorized.  (*See id.*).

Instead, they rely on a single sentence in *Atherton v. F.D.I.C.*, in which the Supreme Court observed that "the existence of related federal statutes" does not "automatically show that Congress intended courts to create federal common-law rules[.]"  519 U.S. 213, 218 (1997) (alteration added; citation omitted).  This statement's relevance is lost on the Court.  Section 78u is not merely *related* to this litigation — it specifically *vests* the Court with equity jurisdiction.  Where courts have "express congressional authorization to devise a body of law directly," they may apply federal common law.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004) (citations omitted).

Section 78u empowers the Court to grant equitable relief in securities cases.  *See* 15 U.S.C. § 78u(d)(5).  That includes the power to make full use of an equity receiver to return funds to investors, *see S.E.C. v. First Choice Mgmt. Servs.*, No. 3:00-cv-446, 2010 WL 148313, at *9 (N.D. Ind. Jan. 12, 2010) (observing that the traditional equity powers conferred on district courts by section 78u(d)(5) "include the freezing of assets and the appointment of a receiver to return funds

---

[17] The Complaint alleges a host of securities laws violations.  (*See* Compl. ¶ 9).

to swindled investors"), and to apply equitable principles in distributing those funds, *see Res. Fund Secs. & Derivative Litig. v. Res. Mgmt. Co.*, 673 F. Supp. 2d 182, 199 n.46 (S.D.N.Y. 2009) (noting that section 78u(d)(5) requires that "equitable principles control the distribution of all remaining Primary Fund assets"). Congressional authorization obviates the federal interest prerequisite,[18] *see Sosa*, 542 U.S. at 726, so the Court may apply equitable principles here.

4.    Foreign Investors' Expectations

Finally, the JOLs argue that applying federal principles of equity would upset foreign investors' "contractual rights and reasonable expectations[.]"    (JOL Objection ¶ 37 (alteration added)). The Feeder Fund Ltd.'s Subscription Agreement — apparently "circulated to every Feeder Fund Ltd. investor" (*id.*) — purports to be "governed by and construed in accordance with the laws of the Cayman Islands, without regard to conflicts of laws principles" such that each "Subscriber submits to the exclusive jurisdiction of the Cayman Islands courts with respect to any actions against the Fund, the Investment Manager, the Administrator or the Fund's board of directors." (Pearson Decl., Ex. B, Feeder Fund Ltd. Subscription Agreement [ECF No. 241-2] ¶ 16).

The Court first notes that the JOLs cite no authority suggesting that investors' choice-of-law expectations should compel application of foreign law in a receivership case. (*See* JOL Objection ¶¶ 37–42).[19]    That is unsurprising. Parties' reasonable expectations may inform choice-

---

[18] Even if the federal interest prerequisite applied here, there remains "a strong federal interest in insuring effective relief in SEC actions brought to enforce the securities laws." *S.E.C. v. Wencke*, 622 F.2d 1363, 1372 (9th Cir. 1980).

[19] *In re Ascot Fund Ltd.*, on which the JOLs rely heavily (*see* SOL Objection ¶ 38 (citing 603 B.R. at 283–84)), did not suggest that investor expectations may compel application of foreign law to a receiver's proposed distribution plan just because representatives of a foreign nonmain proceeding so desire. It considered only whether to recognize a proceeding in the Cayman Islands as a foreign main proceeding in a Chapter 15 bankruptcy case. *See In re Ascot Fund Ltd.*, 603 B.R. at 278. In its analysis, the bankruptcy court noted that "a court may . . . consider the expectations of creditors[,]" among other factors. *Id.* at 279 (alterations added; citation and quotation marks omitted). Here, the Court has already recognized the JOLs as representatives of a foreign nonmain proceeding. (*See generally* Recognition Order). Allowing them to impose their choice-of-law preferences at this stage would interfere with the Receiver's duty to "develop a

24

of-law analyses in contract disputes, *see, e.g.*, *NL Indus. v. Com. Union Ins. Co.*, 65 F.3d 314, 327 (3d Cir. 1995), but equity receiverships are a different creature.

The JOLs seek to extend the Subscriber Agreement's choice-of-law provision to the Receiver. But as the Receiver's Reply points out, the choice-of-law provision only binds "subscribers" bringing actions against "the fund, the investment manager, the administrator, or the fund's board of directors[.]" (Receiver's Reply 16–17 (alteration added; emphasis omitted; citing Feeder Fund Ltd. Subscription Agreement ¶ 16)). The Receiver is not a subscriber suing "the fund, the investment manager, the administrator, or the fund's board of directors[.]". (*Id.* (alteration added; emphasis omitted)). He acts "for the benefit and on behalf of the Receivership Estate" and may only initiate legal actions in that capacity. (May 11, 2020 Order ¶ 37). The Receiver's Proposed Distribution Plan need not be stifled by a choice-of-law provision concerning "entirely different parties under entirely separate contracts." *Capitol Life Ins. Co. v. Gallagher*, 839 F. Supp. 767, 769 (D. Colo. 1993).

Neither the Receiver nor the Court owes foreign investors strict adherence to a choice-of-law provision that binds only the foreign investors. The Court need only ensure that their interests are "sufficiently protected." *SNP Boat Serv. S.A. v. Hotel Le St. James*, 483 B.R. 776, 784 (S.D. Fla. 2012). The Proposed Distribution Plan protects foreign *and* domestic interests by treating investors equally.

In short, the JOLs' objection does not persuade the Court to adopt Cayman law. Applying Cayman law would produce a harsh and unequal result without a proper basis. The Court exercises

---

plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property[,]" (May 11, 2022 Order ¶ 46 (alteration added)); which the Recognition Order expressly disallows (*see* Recognition Order ¶ I). Comparisons to *In re Ascot Fund Ltd.* are thus inapposite.

CASE NO. 20-21964-CIV-ALTONAGA/Goodman

its discretion to reject the JOLs' arguments.  It evaluates the Proposed Distribution Plan according to federal principles of equity.

### B.      Proposed Distribution Method

The Receiver's Proposed Distribution Plan distributes funds to investors on a *pro rata* basis.  (*See* Mot. 15–16).  *Pro rata* distributions have become commonplace in equity receivership cases.  *See U.S. S.E.C. v. Infinity Grp. Co.*, 226 F. App'x 217, 218 (3d Cir. 2007).

The alternative — which involves tracing each claimant's investment funds — "has been almost universally rejected by courts as inequitable."  *S.E.C. v. Byers*, 637 F. Supp. 2d 166, 177 (S.D.N.Y. 2009) (collecting cases).  "[W]hether at any given moment a particular customer's assets are traceable" can be arbitrary.  *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89 (2d Cir. 2002) (alteration added).  In such cases, a lucky investor whose money is easily traceable may recoup her entire loss during the first distribution, leaving less in the pot for unlucky investors who must wait for subsequent distributions because — through no fault of their own — their investments are not presently traceable.  Equity does not allow tracing where it would give preference to investors whose funds are traceable over other investors who "occup[y] the same legal position[.]"  *Elliot*, 953 F.2d at 1570 (alterations added; citing *Cunningham*, 265 U.S. at 13).  The Court thus agrees that tracing is not appropriate here.[20]

The Receiver's *pro rata* distribution scheme comports with standard practice.  Courts "repeatedly have recognized that *pro rata* distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion in approving such

---

[20] For this reason, the Unpaid Subscribers Objection fails.  The Unpaid Subscribers Objection joins the JOL Objection's choice-of-law analysis, departing only insofar as it argues that Cayman law also requires tracing.  (*See* Unpaid Subscribers Objection ¶¶ 4, 7–9).  Unsurprisingly, the Unpaid Subscribers' arguments for tracing are all predicated on Cayman law.  (*See id*. ¶¶ 7–9).  Because federal equity principles, *not* Cayman law, apply here, the Court rejects these arguments.

distributions." *Infinity Grp. Co.*, 226 F. App'x at 218 (collecting cases).  To justify a *pro rata* method, the Receiver need only demonstrate that Defendants commingled investors' funds and the investors occupy the same legal position relative to Defendants.  *See Credit Bancorp, Ltd.*, 290 F.3d at 88–89.  Both elements are present here.

Comingling of funds was central to the master-feeder structure of Defendants' operation.  The Feeder Funds raised money from investors.  (*See* Compl. ¶ 2).  They passed that money on to the Master Fund, which pooled the funds before investing them in at least two dubious business operations.  (*See id*. ¶¶ 2–5).  The Master Fund reported fraudulently strong returns to investors.  (*See id*. ¶¶ 6–7).  If an investor wanted to cash out, the Master Fund would dip into the pooled funds and return money reflecting what the investor's stake *would* have been had the fraudulently high revenue reports been accurate.  (*See* Mot. 20–21, 26).  The Master Fund made these returns "without regard to or accounting for the origin of the investment."  (*Id*. 22–23).  These facts suffice to show the commingling of funds.

Second, investors should be "similarly situated with respect to their relationship to the defrauders."  *Credit Bancorp, Ltd.*, 290 F.3d at 89 (collecting cases).  The investors are so situated here.  (*See* Mot. 19–20).  Accordingly, the Court adopts a *pro rata* distribution scheme.

C.   **Method of Calculating Distributions**

While no one Unsubordinated Net Loser has priority over any other, it does not necessarily follow that the First Interim Distribution should compensate *every* Unsubordinated Net Loser on a *pro rata* basis.  Equity may compel a different approach if some investors have already recovered large swaths of their investments and others have not.  *See S.E.C. v. Detroit Mem'l Partners, LLC*, No. 1:13-cv-1817, 2016 WL 6595942, at *3 (N.D. Ga. Nov. 8, 2016); *S.E.C. v. Forte*, Nos. 09–63, 09–64, 2012 WL 1719145, at *3 (E.D. Pa. May 16, 2012).

Suppose a bank has swindled 12 investors. A plaintiff files a lawsuit, and a court freezes the bank's assets before appointing a receiver to distribute funds back to investors. Now suppose one of the investors managed to recover 80% of her net investment before the asset freeze. A second investor recovered 30%. Finally, there are 10 unfortunate investors who have yet to recover anything.

Equity would not require that the receiver's first interim distribution make the investor with 80% whole at the expense of everyone else. Instead, the receiver may opt to catch the unlucky 10 up to the second investor. That way, the first and second investors might not receive anything from the first distribution, but everyone would have at least 30% of their money back. Future interim distributions would aim to catch the bottom 11 up to the first investor, with the eventual goal of getting everyone back to 100%.

This is referred to as the "rising tide" approach. *Byers*, 637 F. Supp. 2d at 182. It is "the method most commonly used (and judicially approved) for apportioning receivership assets." *S.E.C. v. Huber*, 702 F.3d 903, 906 (7th Cir. 2012) (collecting cases). Rising tide is particularly appropriate where, as here, some claimants have "already received pre-receivership disbursements in excess of [their] calculated pro rata share[s] of a distribution[.]" *Detroit Mem'l Partners, LLC*, 2016 WL 6595942, at *3 (alterations added; citations and quotation marks omitted). Better-off claimants may not receive anything under the First Interim Distribution; they will participate in fewer distributions once the "floor" catches up to their percentage recovery. *See id*.

The Receiver recommends a rising tide approach here. Of the 1,485 swindled investors the Receiver has identified, some have already made out significantly better than others. At the extreme ends are the 565 Net Winners who profited from the Master Fund's scheme and the 589

28

Unsubordinated Net Losers who lost everything.  (*See* July 15, 2022 Status Report ¶¶ 4–5, 8; *see generally* Schedule of Distribution to Unsubordinated Net Losers).

But even a more focused review, limited in scope to the Unsubordinated Net Losers only, reveals significant disparities.  Most of the class, consisting of 872 investors in total, have yet to recover a dime.  (*See generally* Schedule of Distribution to Unsubordinated Net Losers).  At the opposite end of the spectrum, certain Unsubordinated Net Losers have already recouped more than 90% of their net investments.  (*See, e.g., id*. 8–9, 16, 19, 22).  Rising tide would sensibly hold off on distributions to these most fortunate members of the class and prioritize those who have recovered the least.

Peter van de Linde takes a different view.  He asks the Court to reject the Receiver's rising tide approach in favor of one that calculates distributions in accordance with each Unsubordinated Net Loser's net investment, *regardless of how much the investor has already recovered*.  (*See* van de Linde Objection 1–2).  In other words, while the Proposed Distribution Plan deems to first distribute assets to the 764 Unsubordinated Net Investors who have yet to recover 23.05% of their investments — a group that comprises more than 87% of Unsubordinated Net Losers — Mr. van de Linde wants the Court to be more attentive to the class's 108 best-off investors.[21]  (*See id*.).  As he puts it, "there are a considerable number of [Unsubordinated Net Loser] investors who [would] receive some compensation under the net investment method but nothing under the rising tide method[.]"  (*Id*. 2 (alterations added)).

The Court agrees with the Receiver.  The Proposed Distribution Plan need not reduce distributions to the worst-off investors so that those who have already recovered much of their net

---

[21] Unsurprisingly, Mr. van de Linde is part of this relatively well-off minority.  He has already recovered more than half his net investment and thus would not receive anything in the First Interim Distribution.  (*See* Schedule of Distribution to Unsubordinated Net Losers 18).  He nonetheless remains eligible for future interim distributions as the recovery floor rises.

investments can be made whole more quickly.  Rising tide "is most equitable" where it "will most equitably distribute the available assets to those [investors] who benefited the least from pre-Receivership distributions and will equalize, to the greatest extent possible, the total recoveries (pre-and post-Receivership) of each [Unsubordinated Net Loser] on an entity-by-entity basis." *S.E.C. v. Burton Douglas Morriss*, No. 4:12-cv-00080, 2017 WL 7805571, at \*4 (E.D. Mo. June 16, 2017) (alterations added).  The Proposed Distribution Plan equitably distributes $55,452,651 to the 764 worst-off Unsubordinated Net Losers, raising the class's recovery floor to 23.05%.  (*See* July 15, 2022 Status Report ¶¶ 5–6).  The Court thus rejects the van de Linde Objection and concludes that rising tide is the most equitable method for calculating distributions under the Proposed Distribution Plan.

### D.    Equitable Subordination

The Court turns now to the 48 Subordinated Net Losers.  As discussed, the Receiver has discerned that the Defendants swindled money from certain investors not presently classified as Unsubordinated Net Losers.  (*See* Mot. 30–31; July 15, 2022 Status Report ¶ 7).  These Net Loser investors did not invest in the Feeder Funds directly but instead did so through financial institutions with which the Receiver has been in contact.  (*See id.*).

In a March 9, 2021 Order [ECF No. 119], the Court directed financial institutions servicing the Feeder Funds' investors to "disclose the identities of the beneficial owners of each investment and/or subscription they facilitated in [Feeder Fund Ltd.] and [Feeder Fund LP] as of January 21, 2020[.]"   (*Id.* (alterations added; footnote call number omitted)).   The Order also required institutions to furnish "transaction history (inclusive of dates and amounts) sufficient to determine how much cash each beneficial owner transferred to and received from [Feeder Fund Ltd.] and/or [Feeder Fund LP]" as well as "the know your customer and anti-money laundering due diligence

(documents and information) maintained for each beneficial owner" to the Receiver.  (*Id.* (alterations added)).

Despite the Order, certain institutions have yet to provide the Receiver with sufficient information to ascertain the identities of or verify the transactions for their Net Loser clients.  (*See* Mot. 30–31; July 15, 2022 Status Report ¶ 7).   Clearstream and Credit Suisse are two such institutions.   (*See generally* Clearstream Objection; Credit Suisse Objection).   The Proposed Distribution Plan deems to subordinate these investors' claims.  (*See* Mot. 30–31).   Clearstream and Credit Suisse filed objections.  (*See generally* Clearstream Objection; Credit Suisse Objection).

Equitable subordination is an appropriate remedy when financial institutions refuse to provide sufficient information to allow a receiver to identify a beneficial owner.  *See In re Kreisler*, 546 F.3d 863, 865 (7th Cir. 2008); *S.E.C. v. Nadel*, No. 8:09-cv-87, 2013 WL 12323969, at *3 (M.D. Fla. Aug. 29, 2013).   Clearstream and Credit Suisse do not dispute that — notwithstanding the March 9, 2021 Order — they have not provided the Receiver with information sufficient to identify and verify their Subordinated Net Loser clients.  (*See* June 21, 2022 Status Report [ECF No. 269] ¶¶ 4–5).   Their objections thus rest on shaky grounds; they have only themselves to blame for their clients' subordinated status.

That said, the Receiver and the institutional objectors appear to have come to a mutually agreeable resolution on this issue.   The Receiver has agreed to allow Subordinated Net Losers cure their subordinated status, provided they furnish sufficient information.  (*See* Receiver's Reply 20–21).   Clearstream and Credit Suisse have consented to a deadline of December 31, 2022 for Subordinated Net Losers to submit documents to the Receiver.  (*See* Receiver's Reply 21; June 21, 2022 Status Report ¶¶ 4–5).

This resolution renders moot Clearstram and Credit Suisse's objections.  Subordinated Net Losers have until December 31, 2022 to seek unsubordinated status.  Any claims that remain unsupported by sufficient documentation thereafter may be subordinated.

### E.     Other Objections

Finally, the Court addresses the Manning and Kaufman objections.  Both concern claims against the Receivership Entities.

#### 1.     The Manning Objection

The filers of the Manning Objection are not Feeder Fund investors.  (*See* Manning Objection ¶ 9).  They are plaintiffs in a lawsuit against the Master Fund and Jeremy Monte in Collins County, Texas.  (*See id*.).  They allege that the Master Fund illegally tried to seize their business and is now liable for more than $10 million.  (*See id*.).  That litigation is currently stayed, pending resolution of this matter.  (*See id*.).

According to the Manning Objection, the First Interim Distribution of $55,452,651 would deplete more than 80% of the Receivership Assets, rendering the Receivership Entities judgment-proof.  (*See* Manning Objection ¶ 11).  It asks the Court to reduce the size of the First Interim Distribution and order the Receiver to set aside funds sufficient to satisfy future judgments against the Receivership Entities.  (*See id*. ¶ 13).  The Receiver disagrees.  He estimates that claims against the Receivership Estate will not exceed $3 million and thus proposes a smaller set-aside.  (*See* Mot. 35).

Disputed claims against a receivership estate do not prevent a court from authorizing a distribution, provided the receiver sets aside funds sufficient to cover those claims.  *See S.E.C. v. Michael Kenwood Cap. Mgmt*., 630 F. App'x 89, 91 (2d Cir. 2015) (affirming a district court's approval of a distribution plan that set aside funds equal to what the receiver concluded was the

"maximum possible value" of the claims against the receivership entities).  How much a receiver must set aside is fact dependent and may be subject to modification in the face of changing circumstances.  *See Res. Fund Secs. & Derivative Litig.*, 673 F. Supp. 2d at 206.

For now, the proper set-aside amount is an academic question.  If the Court approves the Proposed Distribution Plan — as it deems to do here — at least one of the objectors is likely to appeal.  At that time, the Court will stay this Order pending resolution of the appeal.

The Court is in no position to predict the status of the Receivership Estate post-appeal.  It has been in a state of constant flux since the Receiver's appointment more than two years ago.  (*Compare* Compl. ¶ 8, *with* Mot. 23–26).  The value of the Receivership Assets will continue to grow and shrink as the Receiver litigates an appeal, identifies more investors, sells off assets, prosecutes claims against debtors, and settles claims against the Receivership Estates.  (*See* Mot. 23–26; 34–35; 38–39).  Speculating whether a set-aside suitable to present conditions will be equally well-suited to future conditions is a fool's errand.

Accordingly, the Court defers ruling on the Manning Objection until appeals of this Order have been fully resolved.

### 2.   The Kaufman Objection

Finally, the Kaufman Objection concerns 27 trade creditors that won a judgment against Feeder Fund LP in an Australian court.  (*See* Kaufman Objection ¶¶ 1–2).  These trade creditors value their claims somewhere between $2 million and $3 million.  (*See id.* ¶ 10).  The Objection seeks payment of their undisputed claims and enactment of a "dispute resolution process for the timely resolution of any disputed claims."  (*Id.* ¶ 1).

CASE NO. 20-21964-CIV-ALTONAGA/Goodman

At the July 11, 2022 hearing, the Receiver's counsel offered to produce a dispute resolution process within 30 days.   The trade creditors' counsel agreed to this timeline.   That moots the Kaufman Objection.

### IV.   CONCLUSION

In summary, the Court holds that the Proposed Distribution Plan is "fair and reasonable" under present conditions.  *Walsh*, 712 F.3d at 754.  It thus approves the Receiver's *pro rata*, rising tide distribution scheme.  At the same time, the Court declines to pass on how much the Receiver must set aside for future claims until this matter has been fully litigated on appeal.  Accordingly, it is

**ORDERED AND ADJUDGED** that the Receiver, Jonathan E. Perlman's Motion for Approval of Distribution Plan and First Interim Distribution **[ECF No. 208]** is **GRANTED in part**. The Court **defers judgment** on the Manning Objection **[ECF No. 237]** until all appeals of this Order have been resolved.  Any remaining objections are **DENIED**.  Finally, the Receiver must file a dispute resolution process for the trade creditor claims discussed in the Kaufman Objection **[ECF No. 242]** by **August 22, 2022**.

This Order is stayed until **September 6, 2022** to allow the filing of an interlocutory appeal.

**DONE AND ORDERED** in Miami, Florida, this 4th day of August, 2022.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

34