UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-21964-CIV-ALTONAGA/Goodman

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

TCA FUND MANAGEMENT
GROUP CORP.; *et al.*,

    Defendants.
_____/

## ORDER

**THIS CAUSE** is before the Court on Receiver, Jonathan E. Perlman's Motion for Approval of Creditor Distribution Plan and First Interim Distribution to Creditors [ECF No. 294], filed on August 22, 2022. In an August 25, 2022 Order [ECF No. 295], the Court instructed the Receiver to publish the Motion and issued a September 26, 2022 deadline for creditors to file responses. (*See id.* 2–3). Creditors AW Exports Pty Ltd, Warwick Broxom, and Jonathan James Kaufman (the "Kaufman Creditors") filed the only Response [ECF No. 302] on September 26, 2022. The Receiver filed a Reply [ECF No. 306] on October 3, 2022. Being fully informed of the relevant arguments, the underlying facts, and the applicable law, the Motion is granted.

### I. BACKGROUND

This case dates to May 11, 2020, when the SEC's years'-long investigation into Defendants, TCA Fund Management Growth Corp. and TCA Global Credit Fund GP, Ltd.'s fraudulent revenue recognition practices culminated in this suit. The Complaint [ECF No. 1] alleged that Defendants had been reporting deceitfully high returns to investors, who were taking

on heavy losses. (*See id*. ¶¶ 32–33, 39–41, 43–46). That same day, the Court froze Defendants, TCA Global Credit Fund, LP, TCA Global Credit Fund, Ltd., and TCA Global Credit Master Fund, LP's (the "Receivership Entities[']") assets in constructive trust and appointed the Receiver to begin the tricky business of sorting out claims against the Receivership Entities — the value of which far exceeded the cash on hand. (*See generally* May 11, 2020 Order [ECF No. 5]). Both investors and creditors had claims against the Receivership Entities.

Over time, the Receiver grew the Receivership Entities' cash holdings from $287,683 to $67,008,922. (*See* Aug. 4, 2022 Order [ECF No. 284] 10).[1] These gains were the product of "successful recoveries of monies, sale of non-cash assets, as well as institution and resolution of litigation matters." (*Id*. (citation and quotation marks omitted)). Having amassed sufficient funds to begin repaying defrauded investors, the Receiver developed a Proposed Distribution Plan, which called for investors to be reimbursed on a *pro rata*, rising tide[2] basis. (*See id*. 11–12). The Court directed the Receiver to publish the plan and gave investors and creditors alike 60 days to file responses or objections. (*See id*. 1).

One of the objections to the Proposed Distribution Plain came from the Kaufman Creditors. (*See id*. 33–34). The Kaufman Creditors represent a group of 27 trade creditors who had won a judgment against Feeder Fund LP — one of the Receivership Entities — in an Australian court.

---

[1] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[2] A "rising tide" reimbursement scheme involves making initial interim distributions to investors who have yet to recover much, if any, of their investment. (*See* Aug. 4, 2022 Order 27–28). To illustrate, suppose a bank has swindled 12 investors. One investor has already recovered 80 percent of her net investment, a second has recovered 30 percent, and the remaining 10 have yet to recover anything. Under the rising tide model, the first interim distribution would catch the bottom 10 investors up to the second investor, rather than distributing the funds on a *pro rata* basis to all 12. That way, everyone would have recovered at least 30 percent of their investment after the first interim distribution. Future interim distributions would aim to catch the bottom 11 investors up to the first investor, with the eventual goal of getting everyone back to 100% percent. (*See id*. 28).

(*See id*.). They valued their claims "somewhere between $2 million and $3 million." (*Id*. 33 (citation omitted)). Unlike some of the investors who objected to the Receiver's Proposed Distribution Plan (*see, e.g.*, *id*. 13–30), the Kaufman Creditors voiced no issue with the structure of the Proposed Distribution Plan *per se* (*see id*. 33–34). Rather, they lamented that the Receiver had embarked on a project to reimburse investors without first developing "a dispute resolution process for the timely resolution of any disputed [creditor] claims." (*Id*. 33 (alteration added; citation and quotation marks omitted)).

On July 11, 2022, the Court held a hearing at which objectors could voice their opposition to the Proposed Distribution Plan. (*See id*. 2). At the hearing, the Receiver and the Kaufman Creditors agreed to a 30-day timeline, during which the Receiver would "produce a dispute resolution process[.]" (*Id*. 34 (alteration added)). This rendered moot the Kaufman Creditors' objection.

On August 4, 2022, the Court approved the Receiver's plan in part, authorizing a first interim distribution of $55,452,651 to the 764 investors who had yet to recover at least 23.05 percent of their investment.[3] (*See id*. 12, 34). Shortly thereafter, the Receiver filed his Motion, which identifies 27 known unsecured creditor claims valued at $2,207,235. (*See* Mot. ¶ 4). The Receiver also proposes a Creditor Distribution Plan that deems to reimburse creditors in a manner similar to the *pro rata*, rising tide scheme of the Proposed Distribution Plan. (*See id*. ¶ 16).

### A. Creditor Distribution Plan Structure

To start, the Creditor Distribution Plan would set in motion a timeline for the resolution of creditors' claims against the Receivership Entities. (*See id*. ¶ 5). Starting on the date the Court

---

[3] The August 4, 2022 Order authorized the $55,452,651 first interim distribution, but the Court has since stayed the Order pending certain investors' interlocutory appeal to the U.S. Court of Appeals for the Eleventh Circuit. (*See* Sept. 2, 2022 Order [ECF No. 299]; Notice of Appeal [ECF No. 307]). No funds have yet been distributed to investors, nor will they until the appeal is concluded.

grants the Motion (the "Approval Date"), creditors would have 60 days to file their claims. (*See id*.). The Receiver proposes to give creditors notice of this 60-day deadline (the "Claims Bar Date") by publishing it in the *Sun Sentinel* and *Wall Street Journal* within 10 days of the Approval Date. (*See id*.). He also would notify known creditors by mailing information about the Creditor Distribution Plan, including the Claims Bar Date, to each known creditor's last known address. (*See id*.). As the name "Claims Bar Date" suggests, creditors would be barred from filing claims once the 60 days lapse. (*See id*.).

After the Claims Bar Date, the Receiver would have 45 days to "negotiate with claimants regarding any disputed claims and attempt to settle all such claims." (*Id*. ¶ 6). During this negotiation period, the Receiver would file a status report with the Court, providing a "list of allowed creditor claims[.]" (*Id*. (alteration added)). He would also give notice to any potential creditors who had reached out regarding a claim via mail and email. (*See id*.). Thirty days after notice, creditors would be able to file objections to the Receiver's findings with the Court (*see id*. ¶ 7), which would initiate another 30-day period of negotiations (*see id*. ¶ 8). If a creditor and the Receiver were unable to come to an agreement regarding the value of a claim during this period, the Court would hold an evidentiary hearing to adjudicate any lingering disputes. (*See id*.).

Once claims have been resolved, the Receiver proposes situating creditors on equal footing with investors, rather than paying all claims at once. Specifically, the Creditor Distribution Plan would have the Receiver make "a first interim distribution to creditors of 23.05% of each creditor's allowed claim" — the same percentage that the bottom 764 investors are set to receive under the August 4, 2022 Order. (*Id*. ¶ 16). Creditors would then share in future distributions "at the same percentage recovery as investors." (*Id*.).

### B. The Kaufman Creditors' Response

The Kaufman Creditors challenge the Creditor Distribution Plan's structure and timeline as it relates to *known* creditor claims.[4] (*See generally* Resp.). They insist that known creditor claims should be subject to an expedited, 30-day resolution period, during which the Receiver should identify and pay undisputed claims and work to settle disputed claims. (*See id*. 12). If any creditor claims remain unsettled after 30 days, the Kaufman Creditors propose bringing the matter back "to the Court's attention" for further resolution. (*Id*.).

## II. LEGAL STANDARD

District courts have "broad powers and wide discretion to determine relief in an equity receivership." *S.E.C. v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) (citations omitted). That discretion "derives from the inherent powers of an equity court to fashion relief." *Id*. (citation omitted). Consequently, any "action by a trial court in supervising an equity receivership is committed to [her] sound discretion and will not be disturbed unless there is a clear showing of abuse." *Bendall v. Lancer Mgmt. Grp., L.L.C.*, 523 F. App'x 554, 557 (11th Cir. 2013) (alteration added; citations and quotation marks omitted).

In receivership cases, courts need only determine that a proposed distribution plan is "fair and reasonable" under the circumstances. *C.F.T.C. v. Walsh*, 712 F.3d 735, 754 (2d Cir. 2013); *see also S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991). The plan must be crafted "equitably and fairly, with similarly-situated investors or customers treated alike." *S.E.C. v. Credit Bancorp, Ltd.*, 99-cv-11395, 2000 WL 1752979, at *13 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002). As the Supreme Court has long recognized, "equality is equity[.]" *Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (alteration added).

---

[4] The Kaufman Creditors have no objection to the Creditor Distribution Plan as it relates to presently *unknown* creditor claims. (*See* Resp. 12).

### III. DISCUSSION

The Kaufman Creditors object to the Creditor Distribution Plan's proposed timeline for resolution of known claims, as well as its structure, which places creditors on equal footing with investors. The Court will address these arguments, but it must first consider the preliminary issue of whether the Receiver's proposal satisfies due process.

### A.   Due Process

Before approving an equity receiver's proposal for resolving creditor claims against the receivership estate, the Court must take care to ensure that the proposal affords creditors "due process of law" and "adequately protect[s] their property." *Elliott*, 953 F.2d at 1566 (alteration added). In this context, "[d]ue process requires notice and an opportunity to be heard." *Id.* (alteration added; citations omitted). The Receiver's proposal accomplishes both here.

The Creditor Distribution Plan satisfies the "notice" prong because it proposes a 60-day window for creditors to submit claims, during which time the Receiver will notify prospective creditors by publishing the details of the plan and the Claims Bar Date in the *Sun Sentinel* and *Wall Street Journal*, as well as by mailing the aforementioned information to each known creditor's last-known address. (*See* Mot. ¶¶ 5, 9, 11). Other courts have consistently found that this one-two punch of publication and notice-by-mail affords creditors adequate notice of the claims process in equity receivership cases. *See, e.g.*, *S.E.C. v. Path Am., L.L.C.*, No. 15-1350, 2016 WL 4528459, at *3, 6 (W.D. Wash. Aug. 30, 2016); *Firestone Commc'ns, Inc. v. Q Television Network Inc.*, No. 4:05-cv-766, 2009 WL 2949766, at *4 (N.D. Tex. Sept. 14, 2009); *S.E.C. v. Alanar, Inc.*, No. 1:05-cv-01102, 2009 WL 1664443, at *3–4 (S.D. Ind. June 12, 2009). The Court agrees that this approach suffices here.

Turning to the second prong — "an opportunity to be heard[,]" *Elliott*, 953 F.2d at 1566 (alteration added) — the Creditor Distribution Plan again passes muster. The Receiver proposes a window of 45 days after the Claims Bar Date for negotiation with creditors; an additional 30 days for the creditors to file objections; and finally, an opportunity for an evidentiary hearing with the Court if any factual disputes persist. (*See* Mot. ¶¶ 6–8). The promise of an evidentiary hearing affords creditors ample opportunity to make their case before the Court, should their negotiations with the Receiver reach an impasse. That is adequate. *See Elliott*, 953 F.2d at 1567 ("[A] district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts." (alteration added)).

The Court is satisfied that the Creditor Distribution Plan does not offend prospective creditors' due process rights. It thus turns to the Kaufman Creditors' objections.

**B.     Objections**

The Kaufman Creditors voice no objection to the Creditor Distribution Plan's timeline as it concerns creditors who have yet to be identified. (*See* Resp. 12). They ask only that the Court order a second, expedited timeline for those creditors that — like themselves — are already known to the Receiver and the Court. (*See id.*). According to the Kaufman Creditors, this expedited timeline should be set for 30 days, after which the Receiver should first file a motion "seeking authorization for the immediate payout of all undisputed amounts" and then "bring the matter to the Court's attention within another 30 days" if any disputes persist. (*Id.*).

This objection breaks neatly into two sub-issues. The first is whether the Court should reject the Receiver's proposed model of *pro rata*, rising tide distributions in favor of the immediate and full payout that the Kaufman Creditors advocate. The second is whether the Court should adopt

an expedited timeline for the resolution of known creditor claims, *separate* from the lengthier-but-unchallenged timeline that the Creditor Distribution Plan proposes for unknown creditor claims. The Court addresses the two in turn.

1. <u>Rising Tide</u>

To begin, the Court notes that this is an equity receivership case, not a bankruptcy. Certainly, there are cases in which courts fashioning relief in the equity receivership context find "bankruptcy law . . . analogous and instructive[.]" *S.E.C. v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344 (11th Cir. 2017) (alterations added). But the two bodies of law are distinct in that one must acquiesce to the bankruptcy code, while the other serves equity alone. *See Liberte Capital Grp., L.L.C. v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) (distinguishing between bankruptcy receiverships, for which "Congress has spoken by setting forth broad and detailed statutes to guide federal courts[,]" and equity receiverships, which "fall outside the statutory bankruptcy proceedings" and are instead governed by "the traditional, common law powers of equity" (alteration added)). Accordingly, bankruptcy law, while occasionally helpful in equity receivership cases, does not control here. *See C.F.T.C. v. Eustace*, No. 05-cv-2973, 2008 WL 471574, at *7 (E.D. Pa. Feb. 19, 2008). Indeed, courts overseeing equity receiverships treat "case law concerning equity receiverships" as "generally more applicable than bankruptcy case law." *Id*. (citation omitted).

Here, the Creditor Distribution Plan deems to treat creditors the same as the defrauded investors. (*See* Mot. ¶ 16). That means that after the first distribution, each creditor would have recovered at least 23.05 percent of its respective debts. (*See id*.). Creditors would then participate in future distributions on equal footing with the investors. (*See id*.).

The Kaufman Creditors never challenges rising tide as an equitable means of distributing receivership assets (*see generally* Resp.), nor could they. As the Court recognized in the August 4, 2022 Order, rising tide "is 'the method most commonly used (and judicially approved) for apportioning receivership assets.'" (Aug. 4, 2022 Order 28 (quoting *S.E.C. v. Huber*, 702 F.3d 903, 906 (7th Cir. 2012))). The question here is not whether equity *allows* for a rising tide distribution plan similar to the one approved in the August 4, 2022 Order, but rather whether it *compels* preferential treatment for the Kaufman Creditors *because they are creditors*.

The Kaufman Creditors' argument that it does begins with the bankruptcy code, which instructs that creditors must be "paid in full before any funds can be returned to a bankrupt entity for the benefit of the entity's shareholder or []members." (Resp. 6 (alteration added; citing 11 U.S.C. § 507(a); footnote call number omitted)). The Court acknowledges that "one of the general principles" in bankruptcy law is that creditors are typically "paid ahead of shareholders in the distribution of corporate assets[.]" *In re Am. Wagering, Inc.*, 493 F.3d 1067, 1071 (9th Cir. 2007) (alteration added). This firm bankruptcy principle rests on shakier foundations in the equity context, however. Here, courts strive for "equality[,]" not priority. *Cunningham*, 265 U.S. at 13 (alteration added). Thus, courts have not hesitated to group unsecured creditors and defrauded investors together for purposes of equity receivership distribution plans. *See, e.g.*, *C.F.T.C. v. Rust Rare Coin, Inc.*, No. 2:18-cv-00892, 2020 WL 4904165, at *2–4 (D. Utah Aug. 20, 2020); *S.E.C. v. Alleca*, No. 1:12-cv-3261, 2017 WL 5494434, at *5 (N.D. Ga. Nov. 16, 2017).

The Kaufman Creditors also argue that unlike the defrauded investors, they "never even intended to do business with" the Receivership Entities. (Resp. 9). As blameless "victims[,]" the Kaufman Creditors assert they should have priority over the investors who made risky investments. (*Id.* (alteration added)). This argument overlooks the investors' centrality in making a distribution

plan feasible at all. Ignoring this key fact would not foster an equitable result here — quite the opposite.

*Rust Rare Coin, Inc.* helps illustrate why. There, the court considered a distribution plan that "combine[d] claims from unsecured creditors and defrauded investors." *Rust Rare Coin, Inc.*, 2020 WL 4904165, at *2 (alteration added). Unsecured creditors objected that they should be given priority over defrauded investors because they did not make the same risky investments and hence were less blameworthy. *See id*. at *3–4. The court rejected these arguments, reasoning that blameworthiness notwithstanding, equity was "best served" by treating the two classes similarly because "the only reason any funds [were] available to pay the unsecured creditors [was] because of the unlawful investments [the receivership entity] obtained." *Id*. at *4 (alterations added). In other words, the defrauded investors were "in some sense . . . subsidizing the recovery of the unsecured creditors." *Id*. at *3 (alteration added; footnote call number omitted).

So, too, here. The funds to which the Kaufman Creditors seek access exist primarily through the Receiver's sale of special purpose vehicles ("SPVs"). (*See* Aug. 4, 2022 Order 10). These SPVs date back to business loans that Defendants made *with defrauded investors' money*. (*See id*.). When a borrower could not repay its loans, Defendants would initiate a lawsuit, buy up the borrower's assets at foreclosure, and transfer those assets to a new entity, the SPV. (*See id*.). Once the Receiver took over, he began selling the SPVs *for the purpose of repaying investors*. (*See id*.).

Equity does not require that the Receiver toil to recover investors' money — money that was theirs in the first place — only to then let the Kaufman Creditors advance to the front of the line. As in *Rust Rare Coin, Inc.*, the Kaufman Creditors have the investors to thank for *any* distributions they receive here. *See* 2020 WL 4904165, at *3–4. The Court thus concludes that

10

equity allows for the two groups to participate in distributions as equals and rejects the Kaufman Creditors' request for preferential treatment.

### 2. An Alternative Timeline

Because the Kaufman Creditors will receive distributions on equal footing with the defrauded investors, their second objection, in which they seek claim resolution and payment on an expedited timeline relative to the unknown creditors (*see* Resp. 10–12), is moot. The Creditor Distribution Plan proposes a window of at least 180 days before the Court holds evidentiary hearings on disputed creditor claims. (*See* Mot. 9). Once those disputed claims are resolved, the unknown creditors will be on equal footing with defrauded creditors — the same position the Kaufman Creditors now occupy.

Be that as it may, no distributions will issue until the interlocutory appeal pending in the Eleventh Circuit (*see* Notice of Appeal [ECF No. 307]) is resolved. (*See* Aug. 4, 2022 Order 32–33; Sept. 2, 2022 Order [ECF No. 299]). Accordingly, the relative speed with which creditor claims are resolved matters little at present. Regardless of whether it takes 30 days or 180 days to resolve the Kaufman Creditors' claims, investors and creditors alike will have to wait for the interlocutory appeal to conclude before they receive anything. This stay renders the distinction between known and unknown creditors — at least with respect to the dispute resolution and payout timetable — moot.

### IV. CONCLUSION

In summary, the Creditor Distribution Plan is "fair and reasonable" under present conditions. *Walsh*, 712 F.3d at 754. The Court thus rejects the Kaufman Creditors' request for preferential treatment. Investors, known creditors, and unknown creditors will participate in the

*pro rata*, rising tide distribution scheme *as equals* upon resolution of the interlocutory appeal. Accordingly, it is

**ORDERED AND ADJUDGED** that the Receiver, Jonathan E. Perlman's Motion for Approval of Creditor Distribution Plan and First Interim Distribution to Creditors **[ECF No. 294]** is **GRANTED**.

**DONE AND ORDERED** in Miami, Florida, this 2nd day of December, 2022.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:   counsel of record